Filed 5/9/16

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,     )
    )
    Plaintiff and Respondent,     )
    )         S211915
    v.     )
    )         Ct.App. 2/8 B233833
NORMA LILIAN CORTEZ et al.     )
    )         Los Angeles County
    Defendants and Appellants.     )     Super. Ct. No. BA345971
_____)

While riding in a car driven by defendant Norma Lilian Cortez, Rodrigo Bernal fired five or six shots at 19-year-old Emanuel Z. and 16-year-old Miguel Guzman, killing the latter. In a joint trial, a jury convicted defendant and Bernal of premeditated murder and attempted premeditated murder. The Court of Appeal unanimously affirmed Bernal's convictions. However, in a divided opinion, it reversed defendant's convictions based on the following: (1) the giving of CALCRIM No. 361, which instructed jurors that, in evaluating the evidence against a testifying defendant, they could consider the defendant's failure to explain or deny that evidence if the defendant could reasonably be expected to

SEE CONCURRING OPINION.

have done so based on what the defendant knew; (2) the admission of Bernal's out-of-court statement that he and defendant went to shoot some gang members; and (3) the prosecution's comments about the reasonable doubt standard during closing argument. We granted review to consider these issues. Finding no trial errors, we reverse the Court of Appeal's judgment.

## I. FACTUAL BACKGROUND

On September 3, 2008, Miguel and Emanuel, who were childhood friends, were living in a Los Angeles neighborhood near the intersection of 5th and Bonnie Brae Streets. There was 18th Street gang graffiti in the area, and gang members frequented the neighborhood. Miguel and Emanuel, however, were not gang members. As they were crossing 5th Street near the corner of Bonnie Brae Street, Emanuel heard a female ask, " 'Where you guys from?' " Emanuel saw a female driving a car with a male in the front passenger seat and another male in the back. The driver's window was down. Miguel and Emanuel kept walking and did not respond.

Emanuel heard the same female voice say, " 'Let them have it,' " and saw the car stop. The male in the front passenger seat exited the car, pulled a dark-colored gun from his waist area, and began firing at Miguel and Emanuel. Emanuel ran when he saw the gun. Miguel, appearing startled, raised his hands. The man shot five or six times, killing Miguel. Miguel did not have a gun, and no one returned fire.

Emanuel ran into a nearby building and looked out from its balcony. He saw Miguel on the pavement below, receiving help from paramedics. He tried to leave, but police would not let anyone exit the building. He did not immediately speak with police because he was "shocked" and afraid to talk to them. About a week later, as he was visiting Miguel's family at Miguel's house, he unexpectedly encountered detectives and spoke with them. Viewing a six-pack photo array, he identified three women as resembling defendant. He identified Bernal as the

2

shooter from a six-pack photo array, and later identified him again at the preliminary hearing. He did not identify Bernal at trial.

On the day of the shooting, David R., who also lived in the neighborhood, heard the sound of brakes slamming and saw a light beige car stop suddenly. Defendant was driving the car, Bernal was in the front passenger seat, and another passenger — perhaps a child — was in the back. Defendant and Bernal were yelling at Miguel. Because they were yelling over each other, David R. could not understand what they were saying. Miguel may have responded, " '18th Street,' " but he continued walking. Bernal exited the car, pulled a gun from his waist area, and started shooting. Miguel raised his hands and looked scared. After the last shot, the beige car moved a few feet forward and then stopped when Bernal said, " 'Hold on, . . . hold on.' " Bernal entered the car and said, "Let's go, let's go." The car proceeded south on Bonnie Brae Street. After calling 911 and giving the operator a partial license plate number, David R. noticed Miguel lying on 5th Street, not moving or breathing. Police spoke to David R. on the day of the shooting during their canvass of the neighborhood.

Marvin B., who also lived in the neighborhood, was in his apartment when he heard a gunshot. From his window, he saw Bernal standing beside a parked car and shooting. He heard more shots and saw Bernal chase someone across the street. He heard more shots after Bernal left his line of sight. Marvin B. walked outside and saw defendant's car turning right from 6th Street onto Alvarado Street. He saw the female driver's face. He spoke with police at the scene shortly after the shooting and described defendant. He identified her that same day during a field show-up.

At 4:15 p.m., responding officers found Miguel bleeding from his mouth and not breathing. Because the shooting had occurred in 18th Street gang territory, they went to the nearby territory of the rival Rockwood gang. There, they saw a car matching the description — including license plate number — of the car reportedly involved in the shooting, double-parked in the middle of the

3

street with its hazard lights flashing.  They found defendant in the driver's seat and arrested her.  On the car's passenger side, they found a live round of ammunition that matched the caliber and brand of several found at the scene of the shooting.

On September 3, 2008, during a recorded police interview the jury later heard at trial, defendant initially gave the following account:  On the day of the shooting, Bernal asked for a ride to pick up some money.  They stopped and picked up Bernal's friend, who was "very young" and dressed in "gangster attire."  Bernal was in the front passenger seat and his friend was in the back.  Bernal told defendant to " 'just drive around.' "  He then instructed her, first to stop at 3rd and Bonnie Brae Streets so he and his friend could exit, and then to continue driving.  He said he and his friend would catch up with her.  As defendant drove, she heard gunshots from two blocks away at 5th and Bonnie Brae Streets.  Bernal and his friend then reentered defendant's car.  Defendant did not know what had happened and she did not ask about the shots.  She drove to where police later found and arrested her, which was where Bernal and his friend had exited the car and instructed her to wait.  She had known Bernal about a year, and they were friends.  She knew he associated with the Rockwood gang, but did not believe he was a gang member.  She believed he "always carrie[d]" a gun.

Later in the interview, defendant admitted that her initial statement was untrue, and she gave the following, different account:  Before the shooting, she heard Bernal yelling, " 'Where you from?' " to two young men she believed to be gang members.  The young men responded, " '18th Street.' "  Bernal yelled, " 'Rockwood.' "  Defendant told Bernal to " '[l]et it go.' "  Instead, he jumped out of the car, and defendant then heard shots.  The backseat passenger did not exit the car.  Defendant continued driving, but did not get far because of traffic.  Bernal ran and jumped back into the car.  Defendant started to "cuss[] him out."  He said nothing to her except, " 'drive.' "  Defendant kept driving, and was scared.  Bernal told her to stop, and he then exited.  He told her to drive down the block and wait for him.  She did so, stopping and activating her emergency lights.

4

Detective John Motto investigated the shooting. He testified that six bullet casings and one expended bullet were found at the scene, all nine-millimeter but different brands. He also testified that officers commonly find at a single crime scene bullet casings from multiple manufacturers that have been discharged from a single gun.

On September 4, 2008, in a taped interview with police that was played for the jury, Bernal's nephew, Oscar Tejeda, told police that Bernal had come to his apartment and said that he "and this woman . . . went to — we went shooting some 18s," that they "went . . . in her car," and that she "was the one driving" and "he was the one shooting." Tejeda also told police he thought the woman Bernal had identified lived in his (Tejeda's) apartment building. At first, Tejeda said he could not remember the woman's name. Asked whether her name was "Stephanie," "Sylvia," "Nancy," "Mickey," "Martha," or "Norma," he said, "Norma. I think it's Norma." He then confirmed that Bernal had "said her name." The police then asked, "So he told you the girl he went and did the shooting with is Norma?" Tejeda replied, "Yeah. She was driving in her car." He also identified defendant from a six-pack photo array and told police that Bernal was a member of the Rockwood gang, that Bernal's gang moniker was "Scooby," and that defendant socialized with Bernal and other Rockwood gang members.

At trial, Tejeda gave an entirely different account, testifying as follows: Police came to his house with their guns drawn and handcuffed him and his sister. Some hours later, they asked him for a gun and said they would arrest him for aiding a murder suspect if he did not give them one. He replied that he did not know what they were talking about. He was scared. They took him to the station. There, he lied about what Bernal had said and felt pressured by police to do so. In fact, Bernal had said nothing about a shooting. Tejeda nevertheless also testified that the detective who had interviewed him had been friendly and polite. Finally, he testified that he had seen defendant and Bernal socializing with Rockwood gang members and that Bernal was a Rockwood gang member.

5

Gang expert Antonio Hernandez testified that the Rockwood and 18th Street gangs were enemies and occupied adjacent territories. Bernal was a Rockwood member, with the monikers "Scooby" and "Woody." Hernandez did not believe defendant, Miguel, or Emanuel were gang members. Defendant and Miguel each had a triangular, three-dot tattoo that signified the "crazy life" and suggested that its bearer was living a life of doing drugs, drinking, and committing crimes. Both gang members and associates of gangs — those who hang out with gang members but who have not been formally admitted into the gang — commonly have this tattoo.

Presented a hypothetical based on the facts of this case, Hernandez opined that the shooting was for the benefit of the Rockwood gang, the primary activities of which were committing robberies, assaults, extortion, criminal threats, felony vandalism, and narcotics sales. He also opined that it was not safe for gang members casually to enter a rival gang's territory, and that before doing so, gang members would "already have a plan" to "shoot or assault" anyone they "possibly see as an enemy." According to Hernandez, when a gang member asks, "Where are you from," it is a challenge that is intended to initiate a confrontation; those uttering the statement have "made up their mind they are going to assault th[e] person" to whom they are speaking "because they see [the person] as a possible threat."

From jail, Bernal tried sending a letter to Rockwood gang member Jose Birrueta. In it, Bernal stated defendant's full name and booking number, and asked Birrueta to "go and see her at Lynwood jail and talk to her to see what she's saying with me or against me." The letter continued: "If she's against me write to me and let me know what's up so I can make a game plan. If she's with me let me know what she's saying and tell her to change her story because they don't have anything on both of us to say that I wasn't with her that day to let me go. She's the only one holding me back so when I get out I could help her with a lawyer." Bernal asked Birrueta to "brainwash" defendant, "talk to her, convince her to say I

6

was not with her, that they scare her, the police did, and she was just nervous and she just confused." In the letter, Bernal described Emanuel Z. as "the other fool who's snitching me out," and stated: "Could you go . . . talk to him and say different." "My nephew talked to him to say the police scare him and threatened him. So when the detectives came he said what he say, so to say different. He was scared, but it was a lie, what he said when he gets to court."

At trial, defendant testified as follows: She was not a gang member and was not involved in any kind of gang mission on the day of the shooting. On that day, Bernal asked for a ride so he could pick up money he had lent to someone. She replied that she would need gas money if she gave him a ride, and he agreed. They started driving on 6th Street near Bonnie Brae and Alvarado Streets, and picked up Bernal's teenage friend, who got in the back seat. Bernal did not ask for permission to give his friend a ride. Defendant did not ask why the friend entered the car, but assumed it was because he owed Bernal the money. She did not care, and did not see anything wrong in the situation. Bernal told her to continue driving and he would direct her where to go.

As they neared the intersection of 5th and Bonnie Brae Streets, she saw two young men yelling " '18th Street' " and making signs with their hands. No one in her car responded. However, without saying a word, Bernal jumped out of the still-moving car. One of the young men "reach[ed] like a motion like to getting a gun." Defendant, who was still driving, then heard shots. Bernal then reentered the car and said, " 'let's go.' " He directed her to another location. She stopped as instructed, at which point Bernal and his friend exited. She knew something bad had happened, but did not ask what because she was scared. She activated her hazard lights and waited for Bernal's return. She was a "bundle of nerves" and did not go home because she was not thinking. She was "frozen" and did not know what to do. Police arrived 10 minutes later and arrested her. She was not initially truthful with them because she was scared.

7

She met Bernal when she moved into her apartment, and he and some of his friends had offered to help her carry groceries. Their relationship was platonic. She had believed he was a nice, helpful person, and did not think he was a gang member. However, he talked a lot about the Rockwood gang and was proud of it, and got into fights and carried a gun at all times. She knew she lived in Rockwood gang territory, but denied there was gang activity in her neighborhood or the neighborhood where the shooting occurred.

## II. DISCUSSION

As earlier noted, in reversing defendant's convictions, the Court of Appeal majority concluded that three errors cumulatively prejudiced defendant: (1) the giving of CALCRIM No. 361; (2) admission of Bernal's out-of-court statements to Tejeda that he and defendant went to shoot members of another gang; and (3) comments of the prosecution during closing argument that lowered the standard of proof to convict. Below, we address each of these issues in turn.

### A. *The Trial Court Properly Gave CALCRIM No. 361.*

During discussion of the jury instructions, the prosecution asked the court to give CALCRIM No. 361, which addresses a testifying defendant's failure to explain or deny incriminating trial evidence. The prosecution argued that the instruction applied because defendant had inadequately explained during her testimony why she had driven into the neighborhood where the shooting occurred, and had failed to explain why she had stopped the car, why witnesses had heard her screaming from the car, or why she had waited for Bernal at various times. Defendant's counsel disagreed, arguing that defendant had adequately explained her actions. The trial court responded: "You don't have to argue it now. I think, in fairness to the People, I should include it. Then you can argue that there's no such evidence of that." Following CALCRIM No. 361, the court later gave the following instruction: "If the defendant Norma Cortez failed in her testimony to

8

explain or deny evidence against her and if she could reasonably be expected to have done so based on what she knew, you may consider her failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

The Court of Appeal concluded that the giving of this instruction was error because defendant had not failed during her testimony to explain or deny any fact or evidence within her personal knowledge. It reasoned: "She generally explained her actions the day of the shooting. She explained why she gave Bernal a ride (to pick up some money), why she drove to the area of the shooting (she was following Bernal's directions), and why she waited for Bernal after the shooting (she was scared, nervous, and not thinking straight). [The People are] simply incorrect when [they] assert[] that [defendant] failed to explain a number of things within her knowledge. For instance, [the People] argue[] [defendant] did not explain a three-hour discrepancy between the time she said the shooting occurred (approximately 1:00 p.m.) and the time prosecution witnesses said it occurred (approximately 4:00 p.m.). A conflict in the evidence does not equate to a failure to explain. [Citation.] Still, when confronted with the discrepancy on cross-examination, she explained it. She admitted that she was not 'quite sure' the shooting occurred around 1:00 p.m., and it was probable she had been mistaken when she said that it occurred early in the day. [The People] also argue[] she did not explain whether she thought Bernal's friend was dressed like a gang member. But [she] explained the friend's dress, and if there was any failure to explain, it was only because the prosecutor cut her off. . . . In yet another instance, [the People] argue[] [defendant] failed to explain why she did not stop the car to let Bernal in after the shooting. To the contrary, she explained she was not going to 'stop and check' because gunfire had just occurred and she was scared. As a final example, [the People] maintain[] she failed to explain how a live bullet ended up

9

on the floorboard of her car. In fact, she testified she did not put the bullet there, she had no idea how it got there, and she did not know if it was there before Bernal got into the car because she did not check the car before then. [She] explained that the bullet's presence was not within her personal knowledge. She need not have speculated how the bullet came to be there. [Citations.] [¶] [The People] further assert[] that several of [defendant's] statements were implausible and therefore justified the instruction. Whether [the People] found her statements plausible is not the test, however. [Citation.]"

The People continue to assert that the giving of the instruction was proper. Citing *People v. Belmontes* (1988) 45 Cal.3d 744 (*Belmontes*), *People v. Redmond* (1981) 29 Cal.3d 904 (*Redmond*), and several decisions from our Courts of Appeal, they argue the instruction applies not only when a testifying defendant completely fails to explain or deny incriminating trial evidence, but also when the defendant's testimony "contains logical gaps," "creat[es] 'crucial points of conflict' " with other trial evidence, or is otherwise "bizarre," "implausible," or "nonresponsive." Such testimony, the People argue, is "inherently a failure to explain or deny facts," is "the functional equivalent of no explanation at all," and "amounts to a failure to explain or deny evidence." Under these principles, because defendant's testimony "was riddled with implausible statements and logical gaps, and she either did not directly answer or gave vague responses to several of the prosecutor's questions," the trial court properly gave the instruction.

Defendant, on the other hand, continues to assert that the trial court erred. Citing other decisions from our Courts of Appeal and our decision in *People v. Saddler* (1979) 24 Cal.3d 671 (*Saddler*), she argues the instruction applies "only where the defendant completely fails to explain a specific, significant piece of evidence," and "is not justified merely because a defendant's explanation conflicts with other evidence, or because the jury may ultimately disbelieve the defendant's testimony." In her view, decisions indicating that the instruction applies when the defendant's testimony is "bizarre" or "implausible" use those terms not "in the

10

sense" that the testimony is not "believable" or "represents an arguably less likely interpretation of the evidence," but "in the sense" that it "fail[s] to account for indisputable physical evidence or fail[s] to describe what happened during long periods of time — in other words, [it] fail[s] to explain the evidence." Because, under these principles, she "did not fail to explain or deny evidence against her," the trial court should not have given the instruction.

These divergent views are understandable under existing case law. In *Saddler*, *supra*, 24 Cal.3d at page 677, we held that the trial court had erred in giving the following instruction: " 'If you find that [the defendant] failed to explain or deny any evidence or facts against him which he can reasonably be expected to deny or explain because of facts within his knowledge, you may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable.' " (Fn. omitted.) "Under the instruction," we first explained, "inferences are permissible only if the jury finds that [the] defendant failed to explain or deny facts or evidence that he could be reasonably expected to explain or deny." (*Id.* at p. 680, italics omitted.) The instruction was unwarranted, we continued, because "[t]here [were] no facts or evidence in the prosecution's case within [the defendant's] knowledge which he did not explain or deny. There is no indication that he failed to disclose any facts within his knowledge that would have shed further light on the robbery. *There were contradictions between* [*his*] *testimony and that of the prosecution witnesses, but a contradiction is not a failure to explain or deny*. Thus, [the defendant's] testimony that he sometimes smoked Kool cigarettes if offered to him but never 'requested' them and [a police officer's] testimony that on occasion [the defendant] requested a Kool cigarette from him *establishes a clear conflict in the evidence, but it does not constitute, as the People suggest, a failure to explain or deny*." (*Id*. at pp. 682-683, italics added, fn. omitted; see *People v, Marks* (1988) 45 Cal.3d 1335, 1346 [finding "persuasive" the defendant's contention that "he

11

did not fail to explain or to deny any important evidence against him" where "he testified extensively to a version of the events that contradicted the prosecution's case in all important respects"].)

Citing *Saddler*, a number of Courts of Appeal have stated that "a contradiction arising between [a defendant's] testimony and that of a prosecution witness does not constitute a failure to explain or deny" that justifies giving the instruction. (*People v. Ellers* (1980) 108 Cal.App.3d 943, 955; see *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1469; *People v. Kondor* (1988) 200 Cal.App.3d 52, 57; *People v. Mask* (1986) 188 Cal.App.3d 450, 455 (*Mask*); *People v. Roehler* (1985) 167 Cal.App.3d 353, 393, 404.) Based on this principle, some of these courts have also rejected the view that the instruction is warranted where the defendant's testimony is "so improbable it amount[s] to no explanation at all." (*Kondor*, at p. 57.) In the view of these courts, the instruction "is unwarranted when a defendant explains or denies matters within his or her knowledge, no matter how improbable that explanation may appear." (*Ibid*.; see *Lamer*, at p. 1469 [quoting *Kondor*].)

On the other hand, in *Belmontes*, *supra*, 45 Cal.3d at page 784, we held that the instruction had properly been given at trial, explaining: "There were . . . crucial points of conflict between [the] defendant's extrajudicial statements and trial testimony on the one hand, and the physical evidence and testimony of witnesses on the other. . . . [T]hese . . . conflicts were hardly 'tangential, collateral and of little importance.' '[I]f the defendant tenders an explanation which, while superficially accounting for his activities, nevertheless seems bizarre or implausible, the inquiry whether he reasonably should have known about circumstances claimed to be outside his knowledge is a credibility question for resolution by the jury [citations].' (*People v. Mask*[, *supra*,] 188 Cal.App.3d [at p. 455].)" In *Redmond*, *supra*, 29 Cal.3d at page 911, the other decision on which the People rely, we held that the giving of the instruction was justified by "[the] defendant's delay for two months in disclosing the location of the knife" used in

12

the crime, "his failure to summon an ambulance or assist or transport [the victim] for medical assistance, and the variance between the description of [the victim's] wound as 'downward and inward' and defendant's version of an 'upward' thrust caused by [the victim's] fall on the knife." "It is entirely proper," we explained, "for a jury, during its deliberations, to consider logical gaps in the defense case, and the jury is reminded of this fact by the instruction at issue." (*Ibid.*)

To resolve this apparent inconsistency in the case law, we begin with the history of a defendant's right to testify in California. At common law, a criminal defendant was "incompetent to testify under oath in his own behalf at his trial." (*Ferguson v. Georgia* (1961) 365 U.S. 570, 570.) In 1866, the Legislature abolished the common law rule in California by enacting a statute providing that a person charged with a crime "shall, at his own request, but not otherwise, be deemed a competent witness, the credit to be given to his testimony being left solely to the jury, under the instructions of the Court." (Stats. 1865-66, ch. 644 (DCXLIU), p. 865.) Three years later, we held that the prosecution may not comment on a defendant's exercise of the option under this statute *not* to testify; otherwise, by "declining to exercise [the] privilege," the defendant "would practically, if not theoretically, . . . furnish evidence of his guilt that might turn the scale and convict him." (*People v. Tyler* (1869) 36 Cal. 522, 530.) The Legislature effectively codified this holding by enacting Penal Code former section 1323[1] to provide that a defendant's "neglect or refusal to [be a witness] shall not in any manner prejudice him nor be used against him on the trial or proceeding." (1872 Pen. Code, pt. 11, tit. X, § 1323, p. 293; *People v. O'Brien* (1885) 66 Cal. 602, 603.) "[U]nder this section in general it [was] not proper for the district attorney to comment on the effect of the failure of the defendant to testify upon any subject connected with the trial, although he may have been a

---

[1]    All further unlabeled statutory references are to the Penal Code.

13

witness and may have testified on other subjects." (*People v. Mead* (1904) 145 Cal. 500, 506 (*Mead*).)

During the same period, we explained that different rules apply when a defendant *does* testify on a subject. Several of our decisions held that, under these circumstances, the prosecution may comment on the defendant's failure to make an express or explicit denial of facts shown by the prosecution's evidence. (*People v. Mayen* (1922) 188 Cal. 237, 258 [" 'If the defendant in a criminal action voluntarily testifies for himself, the same rights exist in favor of the state's attorney to comment upon his testimony, or his refusal to answer any proper question, or to draw all proper inferences from his failure to testify upon any material matter within his knowledge, as with other witnesses.' "]; *Mead*, *supra*, 145 Cal. at p. 507 [prosecution properly commented on testifying defendant's failure to make "express" or "explicit denial" of circumstance, shown by prosecution's evidence, that the defendant was married to the woman he allegedly allowed to be placed in a house of prostitution]; *People v. Wong Bin* (1903) 139 Cal. 60, 65-66 [because the testifying defendant "went fully into the details of the difficulty, claiming that the killing was in self-defense," the prosecution "was authorized in commenting upon his failure to deny certain alleged statements testified by other witnesses to have been made by him, inconsistent with his testimony given on the trial"].)

In other decisions, our courts explained that, where warranted by a defendant's trial testimony, a court may instruct the jury that " '[a] witness who willfully testifies falsely as to any material fact in giving his testimony is to be distrusted in other parts of his testimony.' " (*People v. Gibson* (Cal. 1917) 33 Cal.App. 459, 462.) This instruction "submits the testimony of the defendant, who testifie[s] in his own behalf, to the usual and general tests of credibility in common with that of the other witnesses." (*Ibid*.) For many years, this principle has appeared in CALJIC section 2.21.2, which provides: "A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You

14

may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars." The principle now also appears in somewhat different form in CALCRIM No. 226, which was given in this case and which provides in relevant part: "If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says." These instructions apply where there is a "material conflict in witnesses' testimony" (*People v. Allison* (1989) 48 Cal.3d 879, 895-896), where there are "inconsistencies within the testimony of a single witness" (*People v. Turner* (1990) 50 Cal.3d 668, 699), where a witness's "efforts to explain away undisputed circumstances are inherently implausible" (*ibid*.), and where a witness's testimony is "vague and improbable" (*People v. Murillo* (1996) 47 Cal.App.4th 1104, 1107).

The legal landscape changed in 1934, when the California electorate, through the initiative process, amended article I, former section 13 of the California Constitution to provide: "[I]n any criminal case, *whether the defendant testifies or not*, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury." (Cal. Const., art. I, former § 13, as amended Nov. 6, 1934, and repealed Nov. 5, 1974, italics added; see *People v. Perry* (1939) 14 Cal.2d 387, 395.) The next year, the Legislature made three statutory changes consistent with the revised constitutional provision: (1) it amended section 1127 to provide that, "in any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court" (Stats. 1935, ch. 718, § 2, p. 1942); (2) it amended section 1093, former subdivision 6, to provide that the judge "may comment on the failure of the defendant to explain or deny by his testimony any evidence or facts in the case against him, whether the defendant testifies or not" (Stats.1935, ch. 718, § 1, p.

15

1941); and (3) it amended former section 1323 to provide that "[t]he failure of the defendant to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by counsel" (Stats.1935, ch. 718, § 3, p. 1942).

About 10 years later, in *People v. Adamson* (1946) 27 Cal.2d 478, 486-490 (*Adamson*), we held that the new state constitutional provision did not violate the federal Constitution. "[T]he consideration and comment" the provision authorized, we explained, "relate[d], not to the defendant's failure to take the stand, but to 'his failure to explain or to deny by his testimony any evidence or facts in the case against him' whether he testifies or not." (*Id.* at p. 488.) In this respect, it "ma[d]e applicable to criminal cases in which the defendant does not testify, the established rule that the failure to produce evidence that is within the power of a party to produce does not affect in some indefinite manner the ultimate issues raised by the pleadings, but relates specifically to the unproduced evidence in question by indicating that this evidence would be adverse." (*Ibid.*) The logical "basis" for this rule was " '[t]he instinct of self preservation,' " which " 'impels one in peril of the penitentiary to produce whatever testimony he may have to deliver him from such peril. . . . Whenever therefore a fact is shown [that] tends to prove crime upon a defendant, and any explanation of such fact is in the nature of the case peculiarly within his knowledge and reach, a failure to offer an explanation must tend to create a belief that none exists.' Therefore the failure of the defendant to deny or explain evidence presented against him, when it is in his power to do so, may be considered by the jury as tending to indicate the truth of such evidence, and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable." (*Id.* at pp. 488-489.) In other words, "[t]he failure of the accused to testify becomes significant because of the presence of evidence that he might 'explain or . . . deny by his testimony' (art. I, [former] § 13, Cal. Const.), for it may be inferred that if he had an explanation he would have given it, or that if the evidence were false he

16

would have denied it.  [Citations.]  No such inference may be drawn, however, if it appears from the evidence that defendant has no knowledge of the facts with respect to which evidence has been admitted against him, for it is not within his 'power' [citation] to explain or deny such evidence.  [Citations.]"  (*Id.* at p. 489.)

In 1965, the Legislature repealed former section 1323 as unnecessary in light of the substantially identical constitutional provision.  (Stats. 1965, ch. 299, § 146, p. 1369; Recommendation Proposing an Evidence Code (Jan. 1965) 7 Cal. Law Rev. Com. Rep. (1965) p. 366.)  The same year, the United States Supreme Court held that article I, former section 13 of the California Constitution violated the Fifth Amendment to the United States Constitution insofar as it permitted comment on a criminal defendant's failure to take the stand and testify at his trial. (*Griffin v. California* (1965) 380 U.S. 609, 613.)  Consistent with this holding, in 1974, the part of article I, former section 13 of the California Constitution that permitted comment on a defendant's failure to explain or deny incriminating trial evidence was deleted (*Strauss v. Horton* (2009) 46 Cal.4th 364, 467, fn. 46), and in 1976, the Legislature deleted the sentence in section 1093, former subdivision 6, that authorized a judge to comment on a defendant's failure to explain or deny incriminating evidence (compare Stats. 1975, ch. 195, § 1, p. 568 with Stats. 1976, ch. 488, § 1, p. 1231).

In *Saddler*, the defendant argued that the 1974 repeal of former article I, section 13 of the California Constitution and the 1976 amendment to section 1093 "indicate[d] legislative disapproval of comment on a defendant's testimony when he takes the stand" and "invalidate[d]" the instruction the court had given on that subject.  (*Saddler*, *supra*, 24 Cal.3d at p. 678.)  We disagreed, based largely on the Legislature's failure to modify Penal Code section 1127 or Evidence Code section 413.  As noted earlier, the former provides that, "in any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court." (§1127.)  The latter, which was enacted in 1965 by the same legislation that

repealed former section 1323 (Stats. 1965, ch. 299, § 146, p. 1369), provides that, "[i]n determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case." (Evid. Code, § 413, as enacted by Stats. 1965, ch. 299, § 2.)

In light of this background, we hold that the instruction applies only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge. The instruction acknowledges to the jury the "reasonable inferences that may flow from *silence*" when the defendant "fail[s] to explain or deny evidence against him" and "the facts are peculiarly within his knowledge." (*People v. Modesto* (1965) 62 Cal.2d 436, 452, italics added.) As to incriminating evidence that a testifying defendant denies or explains, there is no silence from which an inference "may flow." (*Ibid.*) Even if the defendant's testimony conflicts with other evidence or may be characterized as improbable, incredible, unbelievable, or bizarre, it is not, as the People assert, "the functional equivalent of no explanation at all." On the other hand, those circumstances *do* suggest that the defendant may have "deliberately lied about something significant," in which case a court may, as the court did here, instruct jurors to "consider not believing anything that witness says." (CALCRIM No. 226.) Indeed, as explained above, our cases hold that this instruction, or the CALJIC instruction on the subject (CALJIC No. 2.21.2), is warranted under the very circumstances the People claim warrant instruction on a failure to explain or deny, i.e., when there is a "material conflict in witnesses' testimony" (*People v. Allison, supra*, 48 Cal.3d at p. 895), when there are "inconsistencies within the testimony of a single witness" (*People v. Turner*, *supra*, 50 Cal.3d at p. 699), and when a witness's "efforts to explain away undisputed circumstances are inherently implausible" (*ibid.*). (See *People v. Lang* (1989) 49 Cal.3d 991, 1024 [instruction

18

warranted by "sharply conflicting testimony" of the defendant and another trial witness]; *People v. Murillo*, *supra*, 47 Cal.App.4th at p. 1107 ["instruction on a willfully false witness" was warranted by the defendant's "vague and improbable" testimony]). These circumstances implicate a testifying defendant's *credibility* as a witness, and thus are properly addressed by an instruction designed to apply "neutral standards of credibility" to testifying defendants.[2] (*Turner*, *supra* at p. 699.) By contrast, the focus of CALCRIM No. 361, as its language indicates, is not on the defendant's credibility as a witness, but on the role of a testifying defendant's failure to explain or deny incriminating evidence in how jurors "evaluat[e] that evidence," i.e., the evidence the defendant has failed to explain or deny. In other words, as we have stated, a testifying defendant's failure to explain or deny incriminating evidence — i.e., "[a] defendant's silence" — cannot "be regarded as a confession" and "does not create a presumption or warrant an inference of guilt, but should be considered only in relation to evidence that he fails to explain or deny." (*Adamson*, *supra*, 27 Cal.2d at p. 490.)

To the extent *Belmontes* and *Redmond* may be read as indicating otherwise, we overrule them. As explained earlier, in the former, after noting the existence of "crucial points of conflict between" the defendant's testimony and that of other witnesses, we stated, quoting *Mask*, that " '[I]f the defendant tenders an explanation which, while superficially accounting for his activities, nevertheless seems bizarre or implausible, the inquiry whether he reasonably should have known about circumstances claimed to be outside his knowledge is a credibility

---

[2] Both defendant and the People state that a different instruction on false or misleading statements — CALCRIM No. 362 — applies when the defendant's testimony is implausible. However, a 2009 amendment to that instruction clarifies that the instruction applies to false or misleading statements a defendant made "before" trial, not to false or misleading trial testimony. (CALCRIM No. 362; see *People v. Beyah* (2009) 170 Cal.App.4th 1241, 1248 ["We doubt that CALCRIM No. 362 was intended to be used when the basis for an inference of consciousness of guilt is disbelief of defendant's trial testimony . . . ."].)

19

question for resolution by the jury [citations].' " (*Belmontes*, *supra*, 45 Cal.3d at p. 784.) However, in *Mask*, in the sentence preceding the quoted statement, the court, citing *Saddler*, stated: "[T]he mere fact that [a testifying] defendant's story is contradicted by other prosecution evidence does not pave the way for giving the instruction, because contradiction is not by itself a failure to explain or deny. [Citations.]" (*Mask*, *supra*, 188 Cal.App.3d at p. 455.) Moreover, in finding that the instruction had properly been given because the testifying defendant's "story was inherently implausible," the court in *Mask* explained that the defendant had failed "to account" for a three-hour period. (*Ibid.*) Thus, properly understood, *Mask* was simply a case in which the testifying defendant had failed to explain incriminating evidence, i.e., his "presence near the scene of the crime" *at the time* of the crime. (*Ibid.*)

*Mask* cited two decisions as support for the statement *Belmontes* quoted: *People v. Roehler*, *supra*, 167 Cal.App.3d 353 (*Roehler*), and *People v. Haynes* (1983) 148 Cal.App.3d 1117 (*Haynes*). (*Mask*, *supra*, 188 Cal.App.3d at p. 455.) In *Roehler*, the defendant, who was convicted of murdering his wife and stepson while they were all boating together, testified that the boat had capsized accidentally and that he "simply did not know what had happened to them." (*Roehler*, *supra,* at p. 393.) The defendant claimed that the trial court had erred in giving CALJIC No. 2.62, which, like CALCRIM No. 361, addressed a testifying defendant's failure to explain or deny incriminating evidence. (*Roehler*, at pp. 391-392.) The court first explained that "[c]ontradictory testimony by a defendant does not invoke the giving of [the instruction] [citation], nor does failure to recall specific details [citation]." (*Id.* at p. 393.) It then held, however, that the defendant's claim "that *he didn't know* what happened was [not] an explanation of these events which precluded the giving of" the instruction. (*Id.* at p. 394.) It reasoned that the defendant's claim not to know was "a credibility question" and that "the state of his knowledge, what it was reasonable to expect that he *would* know, given the circumstances in which he was, was within the province of the

20

jury to determine." (*Ibid.*) *Roehler* is correct that a defendant's claimed lack of knowledge of relevant facts or circumstances is not an explanation that renders the instruction inapplicable where it appears from the evidence that the defendant "could reasonably be expected to know" those facts or circumstances. (*Adamson*, *supra*, 27 Cal.2d at p. 491.) In other words, as the People argue, "the instruction is not precluded simply because a defendant denies knowledge." However, *Roehler* is not persuasive authority for the broader proposition that the instruction is warranted where the defendant does not merely claim a lack of knowledge, but actually offers a denial or provides an explanation that may be characterized as incredible, unbelievable, or bizarre.

*Haynes* is even less persuasive authority for this proposition. There, the defendant, who had been convicted of committing various sexual offenses against a minor at a motel, claimed on appeal that the giving of the instruction was prejudicial error because there was no prosecution evidence he had failed to explain or deny. (*Haynes*, *supra*, 148 Cal.App.3d at pp. 1118-1119.) In response, the court first noted that the defendant had "stated he 'didn't really notice' that there was a 'big sign out in front of the motel . . . that says, "Adult Movies," ' nor had he noticed that [the minor's] condition was such [that] she had put her jumpsuit on inside out when she dressed prior to leaving the motel." (*Id.* at p. 1120-1121, fn. omitted.) These statements, the court stated, constituted "relatively minor instances of [the defendant's] failure either to deny or explain some potentially incriminating facts — unless it can be said his alleged lack of 'notice,' or inability to 'remember,' the fact in question constituted a 'denial' or an 'explanation' thereof as a matter of law." (*Id.* at p. 1120.) The court next expressed "doubt" that the defendant's reply when asked why he had registered at the motel using a false name and address — " '[I]t's not uncommon for a person that goes to a motel to not use his true name'" — " 'explain[ed]' why the [defendant] so chose to conduct himself on" the occasion in question. (*Id.* at p. 1121.) The court next noted that the defendant's version of the encounter — the

21

girl had eagerly accepted his sexual advances and he did not know her true age —
left unexplained her "bizarre" behavior "as soon as she separated from him," i.e.,
she recorded the license number of his car and "exposed" her family "to the
embarrassment of reporting all the sordid details of their encounter to the police
and, later, to the world at large in a public trial." (*Id.* at p. 1121.) The court then
continued: "It could perhaps be argued that as stressed in the challenged
instruction itself, this might be an instance in which 'a defendant [did] not have
the knowledge that he would need to deny or to explain' why anyone would
behave in so bizarre a fashion. Nonetheless, it would seem such a possibility
should be a question of fact for a jury, not one of law for a trial judge." (*Ibid.*)
Ultimately, however, the court did not decide whether *any* of these "instances"
merely showed "contradictions in the testimony" — which would not have
justified giving the instruction — or "failures" of the defendant "to explain or
deny" — which would have justified giving the instruction — because it found
that any error was not prejudicial. (*Id.* at p. 1122.) The court's unresolved
discussion about whether the defendant had failed to explain or deny incriminating
evidence does not constitute persuasive authority for the proposition that a bizarre
or implausible explanation justifies the giving of the instruction.[3]

In *Redmond*, the defendant argued it was error to give the instruction, not
because there was no evidentiary basis for it, but "because at trial he was not asked
to explain or deny the adverse evidence against him." (*Redmond*, *supra*, 29 Cal.3d
at p. 911.) We rejected that argument, explaining that "[t]he scope of [the
defendant's] direct examination was a tactical trial choice of his counsel." (*Ibid.*)
We then added, as earlier noted, that there was "evidentiary support" in the record

---

**3**    Notably, as this discussion demonstrates, *Haynes*, *supra*, 148 Cal.App.3d at
page 1121, used the term "bizarre" to characterize *the victim's behavior*, not, as
*Belmontes, Mask*, and *Roehler* indicate, the defendant's testimony. (*Belmontes*,
*supra*, 45 Cal.3d at p. 784; *Mask*, *supra*, 188 Cal.App.3d at p. 455; *Roehler*, *supra*,
167 Cal.App.3d at p. 393.)

for the instruction, including the defendant's failure to explain why he waited "two months" before "disclosing the location of the knife" used in the crime or why he "fail[ed] to summon an ambulance or assist or transport [the victim] for medical assistance." (*Ibid.*) These two failures were sufficient to justify giving the instruction. The third basis we identified — "the variance between the description of [the victim's] wound as 'downward and inward' and [the] defendant's version of an 'upward' thrust caused by [the victim's] fall on the knife" (*ibid.*) — was therefore unnecessary. Moreover, under *Saddler*, which *Redmond* failed to cite or discuss, this "variance" (*Redmond*, at p. 911) — i.e., this evidentiary conflict — did not justify giving the instruction. In this respect, we disapprove *People v. Redmond, supra*, 29 Cal.3d 904.

Although we reject the People's position regarding the circumstances that warrant the giving of the instruction, under the preceding principles, we nevertheless agree with the People that giving the instruction in this case was not error. During her testimony, defendant acknowledged that, after Bernal exited her car, she heard gunshots that sounded very close. She also testified, however, that she did not know any of the following information: (1) "why [Bernal] got out" of the car; (2) what had happened; (3) "where [the gunfire] was coming from"; (4) how a bullet ended up on the floorboard of her car; and (5) whether the shooting "could be in regards to gang activity."

However, there was ample evidence that defendant "could reasonably be expected to know" these facts or circumstances. (*Adamson, supra*, 27 Cal.2d at p. 491.) First and foremost, in her own statement to police, which was played to the jury as evidence, she stated the following: Bernal was an "associate" of the Rockwood gang and "talk[ed] a lot about" it. As she approached the area of the shooting, she saw "two young gang members" across the street. Bernal "yelled out, 'Where you from?'" The young men responded, "'18th Street.'" Defendant then said to Bernal, "'Come on, man.' . . . Don't be stupid.'" "'Fool, stop. Stop. Just let it go. Let's go.'" Bernal "didn't listen," and defendant saw him "open[]"

23

the passenger door" and "jump[] out of the car." She heard Bernal yell, " 'Rockwood,' " and "[t]hen [she] heard the gunshots." Though she did not actually see Bernal firing, she "assumed" he was firing "[a]t those kids" who had responded " '18th Street.' " "[I]n [her] mind," Bernal had "hit them up," i.e., "shot at those kids." At that point, she realized it was a gang incident. Bernal then "chased" the car and "got in." Defendant "couldn't believe what [had] happened" and "cussed [Bernal] out," saying, " 'Fucking asshole, what the fuck are you doing?' " Bernal said, " 'Let's drop my homeboy off,' " and told defendant to drive to the location where they had earlier picked up his friend. A few buildings before they reached that location, Bernal told defendant to stop and let him out, and said, " 'meet me there where we picked up homeboy at.' " Defendant replied, " 'Okay,' " drove to the designated spot, stopped her car, put on her emergency lights, and waited. Second, during her trial testimony, defendant added that, before Bernal exited the car, the victims were "yelling out, 'where you from,' " and " '18th Street,' " and were "throwing their arms up in the air, making signs" and "doing hand gestures." Finally, other witnesses testified at trial that the driver of the car slammed on the car's brakes and, along with the passenger, was yelling at the victims; that a female in the car said, " 'where are you from' " and " 'Let them have it' "; that the passenger exited the car and started shooting from the passenger side, either from the trunk area or from over the roof while resting his arm and hand on it; and that after the shooting, the shooter yelled, " 'Hold on,' " the driver slammed on her brakes again, the shooter jumped back in, and the car drove away. Given this evidence, the trial court properly gave the instruction notwithstanding defendant's professed lack of knowledge about certain matters.[4]

---

[4] Given this conclusion, we need not examine the many failures to explain or deny that the People assert. We note, however, that the People's argument, insofar as it rests on defendant's failure to explain contradictory testimony or on the implausibility of her testimony, is inconsistent with the preceding analysis.

24

### B. The Trial Court Properly Admitted Bernal's Statement to Tejeda.

As noted above, the prosecution played at trial a tape of Tejeda's interview with police. During that interview, Tejeda stated that Bernal had come to his apartment and said that, the previous day, he " 'and this woman . . . went to — we went shooting some 18s, like at some 18s.' " Regarding defendant's participation, Tejeda variously told police that Bernal had said the following: (1) we " 'went there in — in her car, and . . . we went to shoot at two 18s' "; (2) the woman " 'was the one driving' " and " 'he was the one shooting' "; (3) " 'he went with some lady to go shoot somebody' "; (4) " 'we went shooting some — some gang member' "; (5) " 'yesterday we went and we shot at two 18s' "; (6) " 'he went with some — the girl, the driver was a girl. She was the one driving, this woman. And he went with her and he was the one shooting' "; (7) " 'they went shooting in a car' "; (8) he " 'went shooting some 18-year-old with this girl, a friend' "; (9) he " 'went there in — in her car, and he's like, and we went to shoot at two 18s' "; (10) " 'we went, me and this woman, . . . we went to — we went shooting some 18s, like at some 18s' "; (11) " 'she came and, that woman, went in her car, and they went to shoot at some 18s' "; (12) he " 'went yesterday with a woman and shot at some 18s' "; and (13) " 'the girl he went and did the shooting with is Norma.' "

Before trial, defendant requested exclusion of the tape insofar as it related Bernal's statements to Tejeda, arguing in part that those statements were inadmissible hearsay and, alternatively, should be excluded as a matter of discretion under Evidence Code section 352 because their probative value was "substantially outweighed by" their potential for "undue prejudice." The prosecution asserted that the statements were admissible under section 1230 of the Evidence Code, which establishes an exception to the hearsay rule for statements against penal interest, i.e., where "the declarant is unavailable as a witness and the statement, when made, . . . so far subjected [the declarant] to the risk of . . . criminal liability, . . . that a reasonable man in his position would not have made

25

the statement unless he believed it to be true." In response, defendant argued that (1) the references to her in the statements were outside of the exception because they were not disserving of Bernal's penal interest, (2) Tejeda's reliability was questionable because he did not and could not know the identity of the woman Bernal had mentioned, and (3) the statements were unduly prejudicial in that they could "easily [be] misconstrued to implicate [her] as being somehow involved in the planning or the underlying conduct or the planning or participation or knowledge of the shooting." The trial court ruled that the statements qualified for the hearsay exception, that they were reliable, and that exclusion under Evidence Code section 352 was not appropriate.

Applying the abuse of discretion standard, the Court of Appeal reversed. It agreed that the statements were against Bernal's penal interest, that the "setting" in which he made them — "a discussion in the family home between close family members" — "promoted truthfulness," and that the statements "were trustworthy to the extent [Bernal] reported on []his own actions and thoughts." However, invoking an argument defendant had not made in either the trial court or her appellate briefs, the court concluded that, "[a]s against" defendant, the statements "lacked a guarantee of trustworthiness." It reasoned: "The references to a woman or lady and the phrase 'we went' necessarily implied that he [Bernal] *and Cortez* went to go shoot someone that day. The statements suggest Cortez knew of a plan to commit the shooting and went along with it. Indeed, the prosecutor argued to the jury that Bernal's statements were evidence Cortez knew of Bernal's purpose and had the intent to assist him. The prosecutor stated: 'And when the nephew talked to the police about what his uncle told him, he repeatedly said that his uncle told him we went, we went and shot at some 18[s]. That is how you know she had the knowledge of his purpose going there and she had the intent to assist him.' However, Bernal could not speak from personal knowledge in describing Cortez's state of mind. His statements in that respect were speculation and hence not trustworthy." Therefore, the statements should not have been admitted without

26

redacting "[r]eferences to 'we,' a lady, or a woman," i.e., "the portions that specifically implicated" defendant.

We conclude that the Court of Appeal erred in finding that the testimony was inadmissible because Bernal lacked personal knowledge of whether defendant knew of and went along with a plan to commit the shooting. The Evidence Code declares that "the testimony of a witness [at trial] concerning a particular matter is inadmissible unless [the witness] has personal knowledge of the matter." (Evid. Code, § 702, subd. (a).) California courts have extended this personal knowledge requirement to statements of hearsay declarants. (*People v. Valencia* (2006) 146 Cal.App.4th 92, 103-104.) When a witness's personal knowledge is in question, the trial court must make a preliminary determination of whether "there is evidence sufficient to sustain a finding" that the witness has the requisite knowledge. (Evid. Code, § 403, subd. (a)(2).) "Direct proof of perception, or proof that forecloses all speculation is not required." (*Miller v. Keating* (3rd Cir. 1985) 754 F.2d 507, 511.) The trial court may exclude testimony for lack of personal knowledge " '*only if no jury could reasonably find* that [the witness] has such knowledge.' " (*People v. Anderson* (2001) 25 Cal.4th 543, 573.) Thus, "[a] witness challenged for lack of personal knowledge *must . . .* be allowed to testify *if there is evidence from which a rational trier of fact could find* that the witness accurately perceived and recollected the testimonial events. Once that threshold is passed, it is for the jury to decide whether the witness's perceptions and recollections are credible. [Citation.]" (*Id.* at p. 574.) An appellate court reviews a trial court's determination of this issue "under an abuse of discretion standard." (*People v. Tatum* (2003) 108 Cal.App.4th 288, 298, citing *People v. Lucas* (1995) 12 Cal.4th 415, 466.)

The record here reveals no abuse of discretion. Insofar as Bernal's statements suggest that defendant knew of and went along with a plan to commit the shooting, there was ample evidence from which a rational trier of fact could conclude that Bernal had personal knowledge of these matters. As defendant

27

concedes, evidence other than Tejeda's statement "overwhelmingly established" that Bernal "rode with" defendant "to the location of the shooting" and "shot at [the victims] while [defendant] drove." There was also evidence of the following: (1) Bernal and defendant were neighbors and did favors for each other; (2) after agreeing to give Bernal a ride, defendant, who believed Bernal always carried a gun and was an associate of the Rockwood gang, drove where Bernal instructed, first to pick up a friend of Bernal's who defendant thought looked like a "gangster," and then to the location of the shooting; (2) as she approached the victims, defendant "slam[med]" on the brakes and stopped the car; (3) after the car stopped, one of the victims — Emanuel Z. — heard a female voice ask, " 'Where you guys from,' " which is something a gang member commonly asks his or her intended victims just before initiating a planned assault; (4) defendant grew up around gangs and had friends and relatives in gangs; (5) Emanuel Z. then heard the car's occupants yell at him and Miguel, and heard a female voice say, " 'Let them have it' "; (6) Bernal then got out of the stopped car and, from the trunk area or over the roof, started shooting at the victims; (7) as the victims fled, Bernal chased them and continued shooting; (8) after Bernal fired the final shots, defendant, knowing Bernal had shot at the victims, moved the car a few feet forward and stopped near Bernal as he was trying to put the gun in his waistband and yelling, " 'Hold on. Hold on' "; (9) after Bernal got in the car and yelled " 'Let's go. Let's go,' " defendant drove the car away, stopped in the middle of the street where Bernal directed her to stop and, after Bernal exited, remained in the driver's seat with the hazard lights on, waiting for him to return. On this record, a jury could reasonably conclude that the shooting was a joint, planned undertaking of Bernal and defendant. It could also reasonably conclude that Bernal and defendant had had conversations in order to coordinate their joint undertaking such that Bernal had personal knowledge of whether defendant knew of and went along with a plan to commit the shooting. Given the evidence, the question of Bernal's personal knowledge about these issues was for the jury.

28

Therefore, the Court of Appeal erred in concluding that, as a matter of law, Bernal's lack of personal knowledge rendered the statements inadmissible.

Defendant argues that Bernal's statements to Tejeda were unreliable for the additional reason that, during his interview with police, Tejeda gave varying accounts of Bernal's statements and could not remember "exactly" what Bernal had said. According to defendant, some of Tejeda's accounts suggest that she knowingly participated in the shooting while others "merely stated that Bernal rode with [her] on his way to the shooting." Because, in light of Tejeda's recantation at trial, the jury had no way to determine the words Bernal used or what he meant by them, the statements were unreliable and inadmissible.

We reject defendant's argument. As to hearsay statements that qualify under the party admissions exception to the hearsay rule (Evid. Code, § 1220), "[w]e have long recognized that . . . persons are often unable ' " 'to state the exact language of an admission.' " ' [Citations.] This recognition, however, does not automatically render any statements of a party inadmissible . . . . " (*People v. Riccardi* (2012) 54 Cal.4th 758, 832.) Nor does ambiguity regarding the meaning of a party's out-of-court statement automatically render the party admissions exception inapplicable. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1122; *People v. Kraft* (2000) 23 Cal.4th 978, 1035.) The same principles logically apply to the admissibility of a hearsay statement under the exception for statements against penal interest. On the record here, neither Tejeda's inability to remember "exactly" what Bernal had said, nor the ambiguity defendant alleges regarding Bernal's meaning, establishes that the trial court abused its discretion in admitting the statement.[5]

---

[5] Our precedents establish that the abuse of discretion test applies in reviewing a trial court's determination that the hearsay statement, as Evidence Code section 1230 requires, "so far subjected [the declarant] to the risk of . . . criminal liability, . . . that a reasonable man in his position would not have made

*(footnote continued on next page)*

Defendant next contends that "the portions" of Bernal's statement to Tejeda "referring to [her] were not against Bernal's penal interest" and therefore did not qualify for the hearsay exception in Evidence Code section 1230. She argues: (1) the exception authorizes admission of "[o]nly those portions of [a hearsay] statement [that] are 'specifically disserving' to the [declarant's] interests"; and (2) Bernal's references to her fail this test because they do nothing more than indicate that he "was accompanied by" her, and "nothing about who accompanied [him] made him more or less culpable in the shooting."

For several reasons, we conclude that the trial court did not abuse its discretion in concluding that the statements were disserving of Bernal's penal interest. Initially, we disagree that Bernal's references to defendant indicate only that she "accompanied" Bernal. As earlier explained, Bernal's references to defendant, along with the other evidence, suggested that he and defendant had engaged in a joint, planned drive-by shooting, thus showing premeditation and implicating him in a conspiracy to commit murder by means of a drive-by shooting. (See *People v. Cortez* (1998) 18 Cal.4th 1223, 1228.) Moreover, Bernal's statement that the person he went with to shoot "some 18s" did the driving provides evidence of one of the elements of a conspiracy conviction: "the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416.)

---

*(footnote continued from previous page)*

the statement unless he believed it to be true." (*People v. Brown* (2003) 31 Cal.4th 518, 536; *People v. Lawley* (2002) 27 Cal.4th 102, 153-154.) Citing *People v. Cervantes* (2004) 118 Cal.App.4th 162, 174-175, defendant argues for de novo review. However, the authority *Cervantes* cited (*ibid.*) involved the separate question of whether admission of a hearsay statement violates the confrontation clause. (See *Lilly v. Virginia* (1999) 527 U.S. 116, 136-137 [(plur. opn. of Stevens, J.)]; *People v. Schmaus* (2003) 109 Cal.App.4th 846, 856; *People v. Eccleston* (2001) 89 Cal.App.4th 436, 445-446.)

In these respects, the portion of the statements referring to a criminal companion were against Bernal's penal interest. (Cf. *People v. Samuels* (2005) 36 Cal.4th 96, 121 [declarant's statement that he was paid by the defendant to commit the killing "was specifically disserving to [the declarant's] interests in that it intimated he had participated in a contract killing — a particularly heinous type of murder — and in a conspiracy to commit murder"].)

On the specific facts of this case, we also disagree that Bernal's identification by name of who accompanied him was not specifically disserving of his interest. Our analysis begins with *Williamson v. United States* (1994) 512 U.S. 594, 600-601 (*Williamson*), where the high court held that the federal hearsay exception for statements against penal interest does not authorize admission of collateral, non-self-inculpatory statements, even if they are made within a broader narrative that contains self-inculpatory statements. In disagreeing that this holding would eviscerate the federal exception, the court explained: "[W]hether a statement is self-inculpatory or not can only be determined by viewing it in context. Even statements that are on their face neutral may actually be against the declarant's interest. 'I hid the gun in Joe's apartment' may not be a confession of a crime; but *if it is likely to help the police find the murder weapon*, then it is certainly self-inculpatory. 'Sam and I went to Joe's house' might be against the declarant's interest if a reasonable person in the declarant's shoes would realize that *being linked* to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy. And other statements that give the police significant details about the crime may also, depending on the situation, be against the declarant's interest. The question . . . is always whether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of all the surrounding circumstances." (*Id.* at pp. 603-604, italics added, fn. omitted.)

31

Here, Bernal's identification of defendant by name, viewed in context, specifically disserved his penal interest in several respects. When Bernal spoke to Tejeda, he said that, after the shooting, he "left the car" and "went in [a] building," that the woman who was driving the car "waited for him while he went in that building," and that she was "caught" while she was "in the car" "[w]aiting" for him "to come back out." Thus, according to Tejeda's statement, when Bernal said that defendant was the one driving, he knew she and her car were already in police custody.[6] He thus also knew that, by identifying her, he was increasing the likelihood that evidence connecting him to the shooting would be found. Indeed, as noted above, police found on the floor of the passenger side of defendant's car a live round matching the caliber and brand of several found at the scene of the shooting. Finally, Bernal knew that "being linked to" defendant "would implicate" him in a drive-by shooting for which defendant had been arrested. (*Williamson*, *supra*, 512 U.S. at p. 603.) For these reasons, Bernal's identification of defendant by name specifically disserved his penal interest. (See *U.S. v. Moses* (3d Cir. 1998) 148 F.3d 277, 280-281 ["by naming [the defendant], as well as the place where he was meeting [the defendant] to make payments, [the declarant] provided self-inculpatory information that might have enabled the authorities to better investigate his wrongdoing"].)

Finally, nothing in the attendant circumstances undermines the trial court's conclusion that Bernal's statements were truly disserving of his interests. As the People assert, "the portions of Bernal's statement that implicated [defendant] were in no way exculpatory" or "self-serving," Bernal "consistently assigned the most

---

[6] Tejeda stated that he "guessed" Bernal was referring to police when Bernal said " 'they' " caught defendant. Tejeda's understanding is fully supported by the evidence, which indisputably shows that the police arrested defendant as she was waiting in her car for Bernal to return from a building. As defendant described Tejeda's statement in her briefs below, Bernal said he " 'watched from inside' " a building " 'as [defendant] was arrested.' "

blame to himself by admitting he was the shooter, and he never attempted to shift blame to [defendant]." Moreover, the context in which Bernal made the statements — a conversation with a close family member in an apartment he frequented — does not suggest that Bernal was trying to improve his situation with police. Indeed, as the Court of Appeal explained, the "setting" for the conversation — "a discussion in the family home between close family members" — "promoted truthfulness." Given the totality of the circumstances, the trial court did not abuse its discretion in finding that Bernal's identification of defendant "so far subjected [Bernal] to the risk of . . . criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.)

Defendant next asserts that the trial court erred in not excluding Tejeda's statements under Evidence Code section 352, which provides in relevant part that a court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice." According to defendant, the statements had only "minimal probative value" because they established only that "Bernal rode with [her] to the location of the shooting," a fact that was "overwhelmingly established by other evidence." They were unduly prejudicial, she continues, because they "could be misconstrued as stating [that she] shared Bernal's purpose." Indeed, defendant asserts, "[t]he prosecutor used the statements for precisely [this] prejudicial effect," arguing to the jury that "Bernal, by saying 'we went,' told Tejeda [that defendant] shared his purpose." Because the statements' "minimal probative value was outweighed by the potential for undue prejudice," the trial court should have excluded them.

Defendant's argument fails because it rests on a mistaken understanding of the term "prejudice" in Evidence Code section 352. For purposes of that section, "prejudice" does not mean damage to a party's case that flows from relevant, probative evidence. Rather, it means the tendency of evidence to evoke an

33

emotional bias against a party because of extraneous factors unrelated to the issues.  (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)  Thus, evidence is subject to exclusion under Evidence Code section 352 on the basis of prejudice only " 'when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' [Citation.]" (*People v. Doolin*, at p. 439.)  As explained above, defendant's claim of prejudice rests only on the potential of Tejeda's statements to show that she shared Bernal's purpose, i.e., the damage to her defense that flowed from those statements as relevant, probative evidence.  She identifies no sense in which the statements would tend to inflame the jurors' emotions or cause them to punish her because of an emotional reaction.  Her claim under Evidence Code section 352 therefore fails.

We also reject defendant's final attack on the trial court's ruling:  that admission of Bernal's statements to Tejeda violated her Sixth Amendment right to confront and cross-examine witnesses.[7]  Defendant rests her argument principally on *Bruton v. United States* (1968) 391 U.S. 123, but that decision is inapposite

---

[7]     The People argue we should not consider this claim because it "is not one of the issues, or fairly included within the issues," they set forth in their petition for review.  However, the People's petition stated the relevant issue as follows: "Is a statement that implicates a nontestifying codefendant *admissible* where it is against the declarant's interest, inextricably tied to and part of the statement against interest, and made under circumstances that this Court and the Court of Appeal have repeatedly deemed to demonstrate trustworthiness?"  (Italics added.) Whether the statement is admissible under the Sixth Amendment is fairly included within this statement of the issue.  However, we note that, under our rules, defendant could have foreclosed the People's procedural argument by raising the issue in an answer to the petition for review.  (Cal. Rules of Court, rule 8.500(a)(2) [party may file an answer to the petition "ask[ing] the court to address additional issues if it grants review"].)

because it involved a nontestifying codefendant's hearsay statement that did *not* qualify for admission against the defendant under any hearsay exception and that was "clearly inadmissible against [the defendant] under traditional rules of evidence." (*Id*. at p. 128, fn. 3.) Indeed, the high court in *Bruton* expressly declined to comment on the admissibility of a nontestifying codefendant's hearsay statement where, as here, a "recognized exception to the hearsay rule" applies. (*Ibid*.) Moreover, in *Davis v. Washington* (2006) 547 U.S. 813, 824, the high court unequivocally held "that the confrontation clause applies *only to testimonial hearsay statements* and not to [hearsay] statements that are nontestimonial." (*People v. Geier* (2007) 41 Cal.4th 555, 603, italics added.) Bernal's statements to his nephew in his nephew's apartment were unquestionably nontestimonial; defendant's counsel expressly "concede[d]" this fact in the trial court and defendant does not now assert otherwise. Thus, binding high court precedent requires us to hold that the Sixth Amendment is inapplicable and that defendant's confrontation clause claim therefore fails.

### C. The Prosecution's Comments on Reasonable Doubt Did Not Constitute Misconduct.

During his rebuttal argument, the prosecutor stated: "The court told you that beyond a reasonable doubt is not proof beyond all doubt or imaginary doubt. Basically, I submit to you what it means is you look at the evidence and you say, 'I believe I know what happened, and my belief is not imaginary. It's based in the evidence in front of me.' " Defendant's counsel objected that these comments "misstate[d] the law." Before the court ruled on the objection, the prosecution added, "That's proof beyond a reasonable doubt." The trial court then overruled the objection.

Defendant asserts that these comments constituted prejudicial misconduct in that they lowered the People's burden of proof. She argues they improperly indicated that "proof beyond a reasonable doubt required no more than a simple

belief, so long as that belief was not based on speculation or imagination," i.e., "a nonimaginary *belief*" that could "be supported by a preponderance of the evidence, or even a strong suspicion." The error was prejudicial, she asserts, because (1) the case against her turned on "a single issue," i.e., her "mental state," (2) the evidence on this issue was " 'close and not particularly strong,' " and (3) the prosecution's comments "permitted the jury to convict [her] when a contrary and innocent interpretation of the evidence was reasonable."

As we have often explained, "it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements [citation]." (*People v. Marshall* (1996) 13 Cal.4th 799, 831.) Improper comments violate the federal Constitution when they constitute a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. (*People v. Hill* (1998) 17 Cal.4th 800, 819.) Improper comments falling short of this test nevertheless constitute misconduct under state law if they involve use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*Ibid*.) To establish misconduct, defendant need not show that the prosecutor acted in bad faith. (*Id.* at p. 822.) However, she does need to "show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." (*People v. Centeno* (2014) 60 Cal.4th 659, 667.) If the challenged comments, viewed in context, "would have been taken by a juror to state or imply nothing harmful, [then] they obviously cannot be deemed objectionable." (*People v. Benson* (1990) 52 Cal.3d 754, 793.)

Applying these principles, we find no misconduct. Initially, we observe that the challenged remarks, viewed in isolation, were incomplete at best. They informed jurors that their "belief" about what had happened had to be "based in the evidence" rather than "imaginary." Although this is a correct statement of the

36

law, it does not alone suffice as a definition of the beyond-a-reasonable-doubt standard.

However, viewing the challenged statements in context, we find no reasonable likelihood that jurors understood them as defendant asserts, i.e., that a "simple," "nonimaginary" belief "supported by a preponderance of the evidence, or even a strong suspicion" was sufficient to convict. Initially, in determining how jurors likely understood the prosecution's arguments, we do " 'not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.' " (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1224, fn. 21 (*Gonzalez*); see *People v. Frye* (1998) 18 Cal.4th 894, 970.)

In light of this principle, it is significant that the trial court properly defined the reasonable doubt instruction in both its oral jury instructions and the written instructions it gave the jury to consult during deliberations. Before the parties gave closing arguments, the court instructed the jury that "[a] defendant in a criminal case is presumed to be innocent," that the People must "prove a defendant guilty beyond a reasonable doubt," and that jurors "must find" defendant and Bernal not guilty "[u]nless the evidence proves [them] guilty beyond a reasonable doubt." Later in its preargument instructions, the court reemphasized numerous times — in connection with the jurors' consideration of defendant's pretrial statements, proof of first degree murder, proof of attempted murder, and proof of enhancement allegations — that it was the People's burden to prove guilt "beyond a reasonable doubt." The first time it set forth the People's burden, the court added: "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." The court later submitted these instructions to the jury in writing to refer to during deliberations. As we have explained, "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments

37

as words spoken by an advocate in an attempt to persuade." (*People v. Clair* (1992) 2 Cal.4th 629, 663, fn. 8.) "[P]rosecutorial commentary should not be given undue weight in analyzing how a reasonable jury understood . . . instructions. Juries are warned in advance that counsel's remarks are mere argument, missteps can be challenged when they occur, and juries generally understand that counsel's assertions are the 'statements of advocates.' Thus, argument should 'not be judged as having the same force as an instruction from the court.' " (*Gonzalez*, *supra*, 51 Cal.3d at p. 1224, fn. 2.)

Indeed, the trial court here emphasized in several ways that jurors should follow its instructions rather than anything potentially contrary in counsels' arguments. In its oral and written jury instructions, the court stated: "If you believe the attorneys' comments on the law conflict with my instructions, you must follow my instructions." The court later emphasized this principle in ruling on objections. After one of defense counsel's arguments, the prosecution interjected: "Objection, that is a misstatement of law." The court responded: "Well, the jurors have been instructed on the law, they will get copies of the jury instructions. If counsel's statement is different than what you understand the law to be based on what I said, you will have to ignore counsel's statement on that." Later, during rebuttal, after the prosecution asserted that defense counsel had made a legal misstatement during closing argument, defense counsel stated: "I'd object[.] I did not misstate the law." The court responded: "The jurors heard what you said, and they can compare it to the laws I gave them."

It is also significant that defense counsel emphasized the court's instructions on reasonable doubt numerous times during closing argument. Early in his argument, he reminded the jury of both the presumption of innocence and the People's burden to prove defendant's guilt "beyond a reasonable doubt." He later briefly referenced the legal "definition" of "reasonable doubt," stating that "it's kind of . . . [legalese] of an abiding conviction." Toward the end of his argument, defendant's counsel became more specific, stating: "Here's that jury

instruction that I mentioned. I'll reference you to the third paragraph. You'll get the document. Proof beyond a reasonable doubt is an abiding conviction that the charge is true." Counsel also added his own gloss on this instruction, stating that an "[a]biding conviction the charge is true . . . is one that's enduring. You're not going to go home and second-guess yourself that you made the right choice. You're certain in your decision making." At another point, counsel emphasized that "[p]roof beyond a reasonable doubt is the greatest burden in our legal system. . . . We want to be virtually certain, as certain as possible in someone's guilt before we take away their liberty."

Also significant is the fact that the prosecution's comments on reasonable doubt specifically referred the jury to the court's instruction on the subject. The prosecution introduced this topic by stating: "Counsel [for defendant] talked to you about reasonable doubt. You have the instruction on that." Only after directing the jury's attention to the court's reasonable doubt instruction did the prosecution discuss defense counsel's "characteriz[ation]" of the standard and submit its alternative view of "what [the standard] means." The court gave correct instructions and the prosecution explicitly deferred to them. Thus, it is unlikely that jurors would have understood the prosecution's statement, "[t]hat's proof beyond a reasonable doubt," made after defense counsel's interruption, to imply either a repudiation of those correct instructions or an invitation that the jury disregard or deviate from them.

Finally, it is significant that the challenged statement was a brief, isolated remark offered in response to defense counsel's misleading comments on the subject. To explain the standard, defendant's counsel stated at one point that "proof beyond a reasonable doubt" is the "amount of evidence" that would enable "[e]ven a mother . . . to believe [her] child is guilty." Defendant's counsel later added: "This is my way to say what is reasonable doubt to you. Ask yourself, 'are you a reasonable person? Would you entertain ridiculous arguments?' . . . You guys are reasonable people. You only entertain reasonable arguments. You

39

will only entertain reasonable doubt.  If you have a doubt, if you're a reasonable person, any doubt you have about the case is reasonable.  If you entertain doubt, it's reasonable."  It is in response to these comments that the prosecutor told jurors that their belief about what had happened had to be "based in the evidence" and "not imaginary."  As the high court has observed, "[i]solated passages of a prosecutor's argument," "like all closing arguments of counsel, are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear."  (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 646-647.)  This general observation is the basis for the rule, as noted above, that "court[s] should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."  (*Id*. at p. 647.)  It aptly describes the isolated remark defendant challenges here, which was surely improvised to answer defense counsel's assertions that (1) proof beyond a reasonable doubt is the "amount of evidence" that would enable "[e]ven a mother  . . . to believe [her] child is guilty,"  and (2) because the jurors were "reasonable people," "any doubt" they had "about the case [was] reasonable."

In summary, given that the challenged comments were brief and constituted a tiny, isolated part of the prosecution's argument, that the prosecution was responding to defense counsel comments, that the prosecution expressly referred the jurors to the instruction they had on reasonable doubt, that both the court and defense counsel properly defined "reasonable doubt" numerous times, and that the jury had written instructions during deliberations that properly defined the standard, we find no reasonable likelihood the jury construed or applied the

prosecution's challenged remarks in an objectionable fashion. We therefore reject defendant's misconduct claim.[8]

### III. DISPOSITION

The judgment of the Court of Appeal's is reversed and the matter is remanded for further proceedings consistent with this opinion.

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
CORRIGAN, J.
KRUGER, J.

---

[8]  Notably, the concurring opinion does not state disagreement with our conclusion that, in the context of the whole argument and the instructions, there is no reasonable likelihood the jury applied the challenged remarks in an improper or erroneous manner. Instead, it abandons our well-established contextual approach to misconduct claims and, citing no supporting authority, evaluates the challenged remarks only in isolation (except in determining prejudice). (Conc. opn. of Werdegar, J., *post*, at p. 3.)

**CONCURRING OPINION BY WERDEGAR, J.**

I concur in the result and most of the reasoning of the majority opinion. I write separately to address the prosecutor's comments on proof beyond a reasonable doubt, which in my view were not merely incomplete but a misstatement of that standard. I also explain my view of why the trial court did not err in admitting evidence of the statement codefendant Rodrigo Bernal made to his nephew Oscar Tejeda.

As the majority acknowledges (maj. opn., *ante*, at p. 36), for a prosecutor to misstate the law in argument to the jury is improper and constitutes misconduct; this is particularly true of the standard of proof beyond a reasonable doubt, which fundamentally defines the People's burden at trial. (*People v. Centeno* (2014) 60 Cal.4th 659, 666; *People v. Hill* (1998) 17 Cal.4th 800, 829.) To establish such misconduct, bad faith or intentional misrepresentation is not required. For that reason, this type of " 'misconduct' " could more aptly be termed prosecutorial " 'error.' " (*People v. Centeno*, *supra*, at pp. 666–667; *People v. Hill*, *supra*, at p. 823, fn. 1.)

In this case, the prosecutor erred—most likely unintentionally—by misdescribing the standard of proof beyond a reasonable doubt to the jury. Responding to a defense argument that overstated the burden of proving guilt beyond a reasonable doubt (see maj. opn., *ante*, at p. 39), the prosecutor stated: "The court told you that beyond a reasonable doubt is not proof beyond all doubt

1

or imaginary doubt.  Basically, I submit to you *what it means is you look at the evidence and you say, 'I believe I know what happened, and my belief is not imaginary.  It's based in the evidence in front of me.'  . . .  That's proof beyond a reasonable doubt.*"  (Italics added.)

The vice in the prosecutor's explanation was that it reversed the standard of proof beyond a reasonable doubt, telling the jury that their belief in guilt need only be nonimaginary, rather than that the evidence must exclude all reasonable *doubts*.  As we explained in *People v. Centeno*, *supra*, 60 Cal.4th at page 672, where we disapproved a similar prosecutorial argument, a statement that the jury must set aside unreasonable inferences is permissible, but does not itself describe the standard of proof:  "It is not sufficient that the jury simply believe that a conclusion is reasonable.  It must be convinced that all necessary facts have been proven beyond a reasonable doubt."  Contrary to the prosecutor's argument here, a belief that is "not imaginary" and is "based in the evidence" does not necessarily meet the beyond a reasonable doubt standard.  By suggesting that the People's burden was satisfied if the evidence supported a reasonable, nonimaginary belief in guilt, the prosecutor erred.

The majority characterizes the prosecutor's remarks as "correct" but "incomplete."  (Maj. opn., *ante*, at p. 36.)  This is a bit like describing the maiden voyage of the Titanic as "incomplete."  The essence of the proof beyond a reasonable doubt standard is its specification of a particular level of certainty on the factfinder's part; omitting mention of that level from an explanation of the standard, as the prosecutor did here, makes the explanation not merely incomplete but wrong.  "Proof to a nonimaginary degree" is not equivalent to proof beyond a reasonable doubt, and the prosecutor erred in saying it is.

To establish a claim for prosecutorial misstatement of the law, defendant must, as the majority states (maj. opn., *ante*, at p. 36), show a reasonable

2

likelihood that the jury understood the comments in an erroneous manner.  (*People v. Centeno*, *supra*, 60 Cal.4th at p. 667.)  The majority finds no such reasonable likelihood here when the prosecutor's remarks are viewed in the context of the court's correct instructions on proof beyond a reasonable doubt, the admonitions given the jury that it must follow the law as provided in the court's instructions over anything contrary in counsel's arguments, and portions of both attorneys' arguments that referred to and quoted the court's instructions on the standard of proof.  (Maj. opn., *ante*, at pp. 37-40.)

In a case where the prosecutor's challenged remarks were ambiguous, so that they could reasonably have been taken in either a proper or objectionable manner, examining the context to determine how the jury would likely have understood them makes sense.  But this is not such a case.  The prosecutor's statement that proof beyond a reasonable doubt "means" that "you look at the evidence and you say, 'I believe I know what happened, and my belief is not imaginary' " is unambiguous, and unambiguously wrong.  Notably, the majority does not attempt to say how this remark reasonably could be understood in an unobjectionable manner.

The contextual factors the majority brings forward are, however, persuasive as to the lack of prejudice from this prosecutor's misstatement of the law.  The prosecutor's isolated misstatement clearly was not so extensive and egregious as to render the trial fundamentally unfair, infringing on defendant's federal due process rights.  The misstatement violated only California law against the use of deceptive methods in jury argument, making it subject only to the prejudice standard generally applicable to state law trial errors, whether a reasonable probability exists the error affected the jury's verdict.  (*People v. Hill*, *supra*, 17 Cal.4th at p. 819; *People v. Espinoza* (1992) 3 Cal.4th 806, 820–821.)  Consequently, for the same reasons the majority finds no reasonable likelihood

3

"the jury construed or applied the prosecution's challenged remarks in an objectionable fashion" (maj. opn., *ante*, at p. 40), I would find no reasonable probability the prosecutor's misstatement of the law affected the jury's verdict.

With respect to the admission of evidence that codefendant Bernal told Tejada that one of his cohorts drove the car used in the shooting and identified defendant by name as the driver, I agree with the majority that the trial court did not abuse its discretion under Evidence Code section 1230. (Maj. opn., *ante*, at p. 33.) But unlike the majority, I would rely only on the inculpatory value for Bernal of linking himself to defendant and her car, knowing she had been arrested in that car. (Maj. opn., *ante*, at pp. 31–32.) The fact that Bernal's identification of a criminal companion as the driver provided evidence of an overt act in furtherance of a conspiracy (maj. opn., *ante*, at p. 30) provides, in this factual context, too weak a connection to criminality to be considered disserving of Bernal's penal interest under Evidence Code section 1230. Knowing that the conspiracy to shoot rival gang members had actually borne fruit in a shooting, which Bernal himself committed, a reasonable person in Bernal's position would not have considered it incriminating to admit that another person had committed a preparatory act in furtherance of the conspiracy.

I concur in the judgment.

WERDEGAR, J.

WE CONCUR:

LIU, J.
CUÉLLAR, J.

4

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Cortez

_____

**Unpublished Opinion** XXX NP opn. filed 5/30/13 – 2d Dist., Div. 8
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S211915
**Date Filed:** May 9, 2016

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Dennis J. Landin

_____

**Counsel:**

Robert E. Boyce and Benjamin B. Kington, under appointments by the Supreme Court, for Defendant and Appellant Norma Lillian Cortez.

Eric R. Larson, under appointment by the Supreme Court, for Defendant and Appellant Rodrigo Alonso Bernal.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael C. Keller, Steven D. Matthews and Zee Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Robert E. Boyce
Boyce & Schaefer
934 23rd Street
San Diego, CA  92102-1914
(619) 232-3320

Zee Rodriguez
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 576-1342