Filed 10/24/25  P. v. Lusk CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　Plaintiff and Respondent,<br><br>v.<br><br>NICHOLAS KARL LUSK,<br><br>　Defendant and Appellant. | F086884<br><br>(Super. Ct. No. F21901636)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Michael G. Idiart, Judge.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberly A. Donohue, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, Plaintiff and Respondent.

-ooOoo-

On April 20, 2023, defendant Nicholas Karl Lusk was convicted of (1) rape of an unconscious person, T.L.; (2) forcible sexual penetration of T.L.; (3) forcible sodomy of S.J.; and (4) forcible rape of S.J.  On appeal, defendant argues:  1) the trial court abused

its discretion and violated defendant's right to due process by precluding him from presenting evidence regarding his attention deficit hyperactivity disorder; 2) the trial court erred by instructing the jurors with CALCRIM No. 361 because defendant did not fail to explain or deny any evidence against him; 3) defense counsel provided ineffective assistance because he failed to introduce evidence showing that T.L. had a motive to lie and failed to object to the prosecutor's argument that T.L. did not have a motive to lie; 4) defense counsel provided ineffective assistance because he failed to object when the prosecutor committed misconduct by defining "abiding" as "long-lasting" and "conviction" as a "belief"; and 5) the trial court erred by denying defendant's *Trombetta*[1] motion because there was reason to believe that defendant's cellphone, which the police destroyed in bad faith, contained relevant messages between defendant and both alleged victims. The People disagree. Because of error in instructing the jury with CALCRIM 361, we reverse the convictions and remand for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

On March 28, 2023, the District Attorney of Fresno County filed a first amended information charging defendant with rape of an unconscious person, T.L. (Pen. Code,[2] § 261, subd. (a)(4); count 1); forcible sexual penetration of T.L. (§ 289, subd. (a)(1)(A); count 2); first degree residential burglary (§§ 459, 460, subd. (a); count 3); forcible sodomy of S.J. (§ 286, subd. (c)(2)(A); count 4); and forcible rape of S.J. (§ 261, subd. (a)(2); count 5).[3]

---

[1]    *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*).

[2]    Undesignated statutory references are to the Penal Code.

[3]    It appears that the charges in this case originally went to trial in December of 2017, the jury could not reach a unanimous verdict, and the prosecutor ultimately dismissed and refiled the case. We do not have the record from the previous case.

2.

On April 20, 2023, defendant was found guilty by a jury on all counts, except court 3, residential burglary.

On August 9, 2023, defendant was sentenced to an aggregate term of 30 years to life and timely appealed.

## FACTUAL SUMMARY

### A. The Prosecution's Case

There were two separate incidents. The first involved S.J., and it occurred on or around April 23, 2016. The second involved T.L., and it occurred on or around July 24, 2016.

#### 1. Sexual Assault of S.J.

S.J. testified that she met defendant through mutual friends in December of 2015. Shortly afterward, they began a relationship that was "physical with a dash of friendship." They had vaginal and oral intercourse. They never had anal intercourse, and they never had rough intercourse.[4]

In the evening on April 22, 2016, S.J., B.M., R.C., and defendant went to a club. S.J. and defendant both drank. B.M. was S.J.'s best friend, and when they left the club, they all went to B.M. and R.C.'s residence. They "hung out" and drank.

Eventually, B.M. and R.C. went to bed. S.J. and defendant were in the living room, and a couple hours later they began engaging in vaginal intercourse on a couch.

They changed positions, and at some point, S.J. was bent over the couch and defendant was behind her. Her hands were on the couch. Defendant then forcefully penetrated her anus with his penis. Defendant did not ask if he could have anal intercourse with her, and she had not told him she wanted to have anal intercourse.

---

**4** At the previous trial, S.J. was asked whether she had ever asked defendant to choke her during sex. She responded, " 'Probably, yes, sir.' " She also testified that she enjoyed rough intercourse.

S.J. felt tearing and burning inside and outside her anus. She told defendant he was hurting her and to get off multiple times. He grabbed the back of her neck and shoved her face into the pillows. His hands were around her throat, and she had issues breathing. She tried punching him and shoving him. He shoved her face further into the pillows.

Defendant alternated between putting his penis into her vagina and her anus. She cried and told him to stop. At some point he pinned her arm down. He also told her to "[s]hut up and take it." Eventually, defendant ejaculated in her vagina. After he finished, he said, "And don't you fucking dare cry rape."

After the incident her body was in pain. She most vividly remembered her knees (which had been pushed into the couch) hurting and her neck hurting.

At some point, defendant left. S.J. stayed for the rest of the night.

S.J. went home in the morning. Later that day she called S.H., and S.H. took her to the hospital.

Defendant and S.J. never had intercourse again, but they stayed in contact via text message for a couple of weeks. S.J. could not remember what the messages were about.

*Nurse Edina Williams*

Edina Williams, a sexual assault forensic examiner nurse, testified that she conducted a sexual assault response team (SART) exam of S.J. on April 23, 2016. As part of this exam, she interviewed S.J. S.J. was "[q]uiet, somewhat withdrawn, and slow to respond." S.J. told her that she and defendant had engaged in consensual vaginal intercourse. However, defendant shoved S.J. onto her knees, held her down, and penetrated her anus with his penis. He also choked her. S.J. tried to stop him, but she could not. Defendant told her to "shut up and take it." Eventually, defendant ejaculated in her vagina. He told her, "don't you dare cry rape." He then kissed her forehead and left.

4.

Williams also physically examined S.J. S.J. had bruising on her right knee, bruising on her upper back, and a bruise on her right arm. She also had a small bruise and an approximately five-centimeter scratch on her neck. Williams did not see any injuries to her genital area or anus.[5] Williams also collected vaginal swabs, cervical swabs, and anal swabs.

### *Criminalist Kara Ward*

Kara Ward, a criminalist with the California Department of Justice, testified that she tested a vaginal swab and an anal swab. "[T]he exact same male profile was obtained from the sperm fraction of the vaginal swab as was obtained from the sperm fraction from the anal swab." Ward compared the DNA profile from the vaginal sperm fraction to defendant's DNA profile, and defendant "could not be excluded as being a contributor."

### 2. *Sexual Assault of T.L.*

T.L. testified that she went "clubbing" with her friend, M.H., and M.H.'s friend, O.O.[6] on July 23, 2016.[7] That night, she met defendant at a "gay club." He was working as a go-go dancer. T.L. thought defendant was gay, and she was not attracted to him.

T.L. danced, including on stage where defendant was dancing, although she did not touch him or flirt with him. She gave her phone number and address to "pretty much everybody that [she] talked to at the club that night." She also had approximately three drinks over the course of the evening.

T.L., M.H., and O.O. left the club at around 1:45 a.m. They went to a liquor store. As T.L. was at the counter purchasing alcohol, she saw defendant and another man, later identified as M.N., walk inside the store. T.L. thought that they were in a relationship.

---

[5] Williams testified that she did not look inside of S.J.'s anal cavity to see if there were "tears, lacerations, bleeding, or bruising."

[6] T.L. was not sure what O.O.'s name was, but M.H. later provided it.

[7] T.L. could not recall the exact date, but based on other evidence, she and her friends went clubbing on July 23, 2016.

She told them she was having an "after-party" at her apartment. She gave defendant her phone number and address, and she told them to come over and drink. However, she did not flirt with defendant.

T.L., M.H., and O.O. went back to T.L.'s apartment. Approximately 30 minutes later, defendant and M.N. showed up. T.L. poured shots for everyone, and she, defendant, and O.O. each took a shot.[8]

Defendant tried to kiss T.L., and she told him she thought he was gay. He said he was not gay, and he tried to kiss her again. T.L. refused because she was not attracted to him. She did not try to kiss him, and neither grabbed the other in a sexual manner.

Defendant and M.N. left after approximately 10 or 15 minutes because no one else showed up, and they wanted to go to a different party. They invited T.L. to come, but she declined. She told them that if the other party was boring, they could call her if they wanted to come back to drink with her, M.H., and O.O.

After they left, T.L., M.H., and O.O. talked and "might have drank a little bit more." After that, O.O. passed out on the floor by T.L.'s front door because he could not walk. M.H. left. T.L. went into her bedroom, locked the door, and went to sleep. She "was an incredibly deep sleeper," and she slept naked.

T.L. woke up because her brain alerted her that something was wrong. She was on her back, defendant was on top of her, and his penis was inside her vagina. She told defendant to stop and tried to push him off. However, she was unsuccessful, and he did not stop. She asked him how he got inside, and he told her he came in through a window. At some point, while kissing her neck, he removed his penis from her vagina and put two fingers inside instead. He eventually removed his fingers and put his penis back inside.

---

[8]     T.L. could not remember if M.H. or M.N. took a shot.

T.L. blacked out. When she "woke up from this blackout," she was on top of him, holding him down by his hair, and punching his face. She then dragged him to the front door and threw him out of her apartment.

T.L. called 911, and a recording of that call was played for the jury. T.L. told the dispatcher that someone broke into her house. When she woke up, that person was on top of her, and she threw him out of her house. The dispatcher asked T.L. if he did anything to her, and she said, "I don't know. I think so." T.L. also told the dispatcher that she thought "that he thought what he was doing was okay."

T.L. spoke to two police officers and then she was taken for a SART exam.

*Testimony of M.H.*

M.H. testified that she was friends with T.L. On July 23, 2016, she went to a nightclub with T.L. and O.O. She did not see T.L. flirt with, or say anything sexual to, defendant.

After M.H., T.L., and O.O. left the club, they went to a liquor store. Right outside the store, she saw defendant with a friend of his. T.L. gave one of them her phone number and address, although M.H. was not sure which one. M.H. did not see T.L. flirt with defendant.

M.H., T.L., and O.O. then went to T.L.'s apartment. Within an hour or two, defendant and his friend showed up. Defendant, defendant's friend, and T.L. each took a shot. Defendant and his friend left after approximately 20 minutes. M.H. did not see T.L. flirt with defendant. M.H. did not hear T.L. invite defendant and his friend to come back later.

M.H. left at around 2:00 or 3:00 a.m. At that time, T.L. was going to her room and O.O. "was kind of passed out in the living room."

*Testimony of M.N.*

M.N. testified that, in the early evening on July 24, 2016, he went to his friend's birthday party at a Basque restaurant. He met defendant at that party. After dinner, the birthday party continued at a nearby club.

As M.N. was leaving the club, he encountered defendant. They went to a liquor store together. They met two women in the store, and one of the women invited them to a party at an apartment. M.N. was very uncomfortable, because he "already felt some sexual innuendos" coming from the women. One of the women, T.L., flirted with defendant. M.N. did not want to go to the party, and he told defendant it was a bad idea. However, he ended up going to the apartment with defendant.

When they arrived, the women from the liquor store were there, and so were two "very intoxicated" people who were on a couch. "The sexual innuendos continued," and T.L. was "way over-the-top flirtatious." M.N. told defendant that there was no party, that he wanted to leave, and that he wanted defendant to leave with him. However, T.L. wanted them to stay, and neither left at that point.

One of the women said, "Let's do shots." M.N. did not do a shot, but defendant and T.L. did. At one point, M.N. saw that defendant's shirt was unbuttoned and T.L. was touching his chest.

After being in the apartment for approximately 20 minutes, M.N. and defendant left so they could go to another club. As they were leaving, T.L. tried to "coerce" defendant into staying. She was also adamant that they return, and she told them that they could come back at any time if they were not having fun.

At the club, defendant encountered a man he knew. Eventually, defendant told M.N. they should go back to T.L.'s apartment because " '[s]he's hitting me up. She wants us to come. She wants us to hang out.' " At around 4:00 a.m., he, defendant, and the man defendant knew left the club to go to T.L.'s apartment.

8.

When they arrived, the gates to the apartment complex were closed. Defendant tried to get in contact with someone who could open the gates. M.N. did not know whether defendant ever got into contact with anyone. However, defendant and the man he knew eventually jumped over a fence to get into the complex, and they headed toward the apartment.

M.N. was driving, and he stayed in his vehicle. The gate opened at one point, and M.N. drove into the complex. M.N. saw defendant knock on the door and ring the doorbell at T.L.'s apartment. M.N. sent defendant multiple text messages stating that he needed to leave and that he could take defendant home. However, defendant did not return to his vehicle, and he left when his phone was out of, or almost out of, batteries.

Later that day, M.N. received a text from defendant. Defendant told him that T.L. had let him in, they "messed around," and T.L. "went all crazy and out of control."

*Crime Scene Technician Catherine Ens*

Catherine Ens, a crime scene technician with the Fresno Police Department, testified that she went to the crime scene on July 24, 2016. Ens was able to lift a print from the exterior of a window into the north bedroom, which had been removed from the windowsill. The print "compared positive to [defendant's] right palm." Additionally, there were muddy footprints below the window to the north bedroom. Ens took pictures of defendant that day, and his shoes were muddy. However, she did not see any evidence of forced entry into the bedroom on the east side of the hallway (which was the bedroom used by T.L.).

*Officer Jeffery Hernandez*

Jeffrey Hernandez, a police officer with the Fresno Police Department, testified that he spoke with T.L. on July 24, 2016. She was distraught, upset, and scared, and he could tell she had been crying.

T.L. told Hernandez that, when she woke up, defendant was on top of her. After she realized what was taking place, she pushed defendant off her. She then pushed his

head into the bed and questioned him. Afterwards, she guided defendant out of her apartment.

T.L. also told Hernandez that she never blacked out, and she did not tell Hernandez that defendant had inserted his fingers into her vagina.

After being recalled by defendant, Hernandez testified that he also spoke to defendant near T.L.'s apartment. Hernandez detained defendant that same day.

### Detective Derek Avila

Derek Avila, a detective with the Fresno Police Department, testified that he interviewed T.L. on July 24, 2016. She told him that, when she woke up, defendant was on top of her. She initially thought she was in bed with someone she loved. It took her a minute to process what was happening. A moment later, she realized that his penis was inside of her vagina. Another moment later, she pushed defendant off. Defendant was courteous and apologetic. She hit defendant in the face more than once and led him out of the apartment. T.L. did not state that defendant inserted his penis into her vagina a second time.

### Nurse Hana Hawari

Hana Hawari, a forensic nurse, testified that on July 24, 2016, she conducted a SART exam of T.L. As part of this exam, she interviewed T.L. T.L. was calm and cooperative. She told Hawari that she went to sleep. When she woke up, "the go-go dancer was on top of [her]." He penetrated her vagina with his penis and finger. She also told Hawari that defendant was "very friendly and apologetic."

Hawari also physically examined T.L. She did not find any injuries. She collected swabs from T.L.'s neck, breasts, abdomen, thighs, cervix, vaginal canal, and anal cavity.

Hawari examined defendant on that same day. She did not find any injuries. She collected swabs from his hands, his penis, and his scrotum.

10.

*Criminalist Joel Thomas*

Joel Thomas, a criminalist with the California Department of Justice, testified that he tested swabs collected from defendant's penis and scrotum. "The non-sperm fraction of the penile swab was a mixture of at least two people[.]" The DNA of the major contributor was consistent with defendant's profile. There was also a minor contributor, and "[t]here were minor alleles that were detected that were consistent with [T.L.'s profile]. So she could not be eliminated as a contributor to the sample." Thomas also tested swabs collected from T.L.'s vaginal canal and cervix. Male DNA was detected on the non-sperm fraction of a vaginal swab.

## B. Defendant's Case

Defendant testified on his own behalf. He said both encounters were consensual.

As to S.J., defendant testified that he met her at a nightclub on April 23, 2016. They got acquainted and then went to her friend B.M.'s house.

At B.M.'s house, S.J. and defendant drank. They then engaged in consensual vaginal intercourse. S.J. asked defendant to choke her and slap her, and he did. At one point, when he was behind her, he asked if he could insert his penis into her anus. She said yes, but told him to "go slow." They started having anal intercourse, but he stopped when she said "ow" and told him to stop. They then had vaginal intercourse again, and he eventually ejaculated in her vagina. He did not ask her if she wanted to engage in vaginal intercourse again because they had already been engaging in consensual intercourse and she did not ask him to stop. After they finished, he told her, "Don't pull that card."

Overall, they had intercourse for approximately four hours. Afterwards, they "hung out" for around an hour or two.

They stayed in contact for approximately a month and a half, and they had intercourse on four other occasions.

11.

As to T.L., defendant testified that he met her in July of 2016. He and M.N., who defendant had just met, went to a liquor store. T.L. and her friend, M.H., were outside the store. T.L. told M.N. and defendant they should come to a party at her residence. T.L. also told defendant that he was "cute" and "looked good."

Defendant and M.N. went to T.L.'s apartment. Only T.L., M.H., and a "Mexican gentleman" were there. Defendant and T.L. took approximately three or four shots. T.L. put her hand under defendant's shirt, rubbed his abdominal muscles, and said, "Damn, you're sexy." Defendant's hand was around her waist, and he grabbed her buttocks and crotch. They also kissed.

Defendant and M.N. stayed for approximately 15 minutes and then went to a club. Before they left, T.L. told defendant to come back afterwards, and she was persistent. Defendant "made a ridiculous remark," asking, "What if the apartment was burned down?" She responded, "Come back."

At the club, defendant met his friend, S.K. At approximately 3:40 a.m., defendant M.N., and S.K. left the club. They headed back to T.L.'s apartment to continue partying. Defendant called and text messaged T.L., but she did not respond.

When they arrived, they did not have a way to get through the gate at T.L.'s apartment complex. They waited for a while, then defendant and S.K. jumped the fence. At some point the gate opened, and M.N. drove into the complex.

They all went to T.L.'s apartment. Defendant knocked on the screen of the front door. He also took the screens off two windows and knocked on those windows. At some point while he was knocking, he heard a thump.

M.N. went back to his vehicle. Defendant thought that people might be smoking in the back of T.L.'s apartment, so he looked over the fence to check. He saw a body inside the apartment, at the front door, so he climbed over the fence. He went to a window to see if it was T.L., but he could not tell if it was her. So, he took the screen off the window. The window was partially open, and he called out, but the body was

12.

unresponsive.  Defendant then tried to open the window, but it "jumped off [the] track and went inward."

The body was still unresponsive, and defendant went through the window to check on the body.  "[I]t was the Mexican male," and he was snoring.

Defendant then went into a room where the door had been propped open, and he saw T.L. sleeping on a bed.  Defendant woke her up to let her know that he was there and that he came in through a window.

When T.L. woke up, she said, "Oh, you came back," and kissed defendant.  Defendant kissed her back.  Defendant got on top of her and started rubbing her crotch through her clothes.  She opened her legs, and defendant asked her if she liked it.  She said she did, and defendant inserted his fingers into her vagina.

T.L. started to remove her pants, and defendant helped.  Defendant then orally copulated her.  After three minutes, defendant asked her, "Do you want to fuck?"  She responded, "Yeah."  Defendant inserted his penis into T.L.'s vagina, but she told him to wait, pushed him, and asked if he had a condom.  He did not, so he orally copulated her again instead.

After that, she laid on defendant's chest and they both fell asleep.  When T.L. woke up, she got dressed.  She then started questioning defendant about what happened.  After she saw the window that defendant entered through, she said, "What the fuck.  … Don't you know I live in the hood?  …  I could break your mother-fucking jaw."  She then got on top of defendant and hit him.  After that she told defendant to leave, and he did.

Defendant went across the street to a convenience store.  While he was there, he saw police officers walking into T.L.'s apartment complex.  He thought they were there because of the broken window, so he called 911 to let them know that he was involved.  However, they hung up after he told the operator that officers had already arrived.  He

13.

then called to an officer who was directing traffic nearby and told that officer he believed he was involved.

*Detective Matthew Ames*

Defendant also called Matthew Ames, a police officer with the Fresno Police Department, as a witness. Ames testified that he interviewed S.J. at the hospital. S.J. told Ames that she was having consensual intercourse with defendant. However, defendant pushed her onto the couch. Her knees were on the floor, and her chest and arms were on the seat of the couch. His hands were around the front and back of her neck. At some point he pushed her further onto the couch, and she was almost completely on her stomach, with her feet hanging off the couch. He alternated between penetrating her anus and her vagina with his penis. She told defendant to stop and attempted to push him off, but he was too strong. Defendant told her to "[s]hut up and take it." After the sexual assault stopped, defendant stated, "Don't you dare pull that fucking rape card." S.J. also told Ames that she did not want to prosecute.

*Detective Loren Kasten*

Defendant also called Loren Kasten, a detective with the Fresno Police Department, as a witness. On April 29, 2016, Kasten called S.J. Kasten asked S.J. if she wanted to pursue charges, and she told him she was unsure. Kasten told her to think about it and call him back by May 2. She did not call back.

*C. The Prosecution's Rebuttal*

Avila testified that he interviewed defendant, and the prosecutor introduced a video recording of that interview.

## DISCUSSION

I. THE TRIAL COURT ERRED BY INSTRUCTING THE JURORS WITH CALCRIM NO. 361 AND THE ERROR WAS NOT HARMLESS

Defendant argues that the trial court erred by instructing the jurors with CALCRIM No. 361 because defendant's "testimony did not represent a complete failure

14.

to explain or deny incriminating evidence, nor did he claim a lack of knowledge about something incriminating that he could reasonably be expected to have known." Defendant further argues that this error was not harmless. The People disagree.

### A. *Applicable Law*

Pursuant to Evidence Code section 413, "[i]n determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him …."

CALCRIM No. 361 "addresses a testifying defendant's failure to explain or deny incriminating trial evidence." (*People v. Cortez* (2016) 63 Cal.4th 101, 110 (*Cortez*).) The trial court provided this instruction to the jury as follows: "If … defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based upon what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove … defendant guilty beyond a reasonable doubt. [¶] If … defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

"[T]he focus of CALCRIM No. 361, as its language indicates, is not on the defendant's credibility as a witness, but on the role of a testifying defendant's failure to explain or deny incriminating evidence in how jurors 'evaluat[e] that evidence,' i.e., the evidence the defendant has failed to explain or deny. In other words …, a testifying defendant's failure to explain or deny incriminating evidence—i.e., '[a] defendant's silence'—cannot 'be regarded as a confession' and 'does not create a presumption or warrant an inference of guilt, but should be considered only in relation to evidence that he fails to explain or deny.' " (*Cortez*, *supra*, 63 Cal.4th at p. 118.) "[T]he instruction applies only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the

15.

defendant could reasonably be expected to have that knowledge." (*Cortez, supra,* at p. 117.)

### B. Standard of Review

"[I]n discussing a substantially similar pattern instruction—CALJIC No. 2.62— our high court recognized that ' "[i]t is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference." ' " (*People v. Grandberry* (2019) 35 Cal.App.5th 599, 606, quoting *People v. Saddler* (1979) 24 Cal.3d 671, 681.) Our task, in determining whether it was error for the trial court to give CALCRIM No. 361, "is to ascertain if defendant … failed to explain or deny any fact or evidence that was within the scope of relevant cross-examination" and "within [his] knowledge." (*Saddler*, at p. 682; see also *Grandberry*, at p. 606.) " 'We review a claim of instructional error de novo.' " (*People v. Parker* (2022) 13 Cal.5th 1, 66; see also *People v. Cole* (2004) 33 Cal.4th 1158, 1217.)[9]

In determining whether an error is harmless, under the more stringent standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24, which applies to errors of constitutional dimension, reversal is required unless the reviewing court can conclude beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman*, at p. 24.) Under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), which applies to errors of state law, reversal is not required unless it is reasonably probable the defendant would have obtained a more favorable result had the error not occurred. (*Watson*, at p. 836.)

---

**9** The People argue that "the trial court did not abuse its discretion in finding that the instruction was warranted based on [defendant's] failure to explain adverse evidence against him." However, the People provide no legal authority suggesting this asserted error is reviewed for an abuse of discretion.

*C.  Additional Background*

On July 24, 2016, Detectives Hernandez and Avila each interviewed defendant regarding the allegations in this case, and officer Bret Hutchins took a statement from him.  Defendant also testified at a previous trial.

When the prosecutor cross-examined defendant, she extensively questioned him about inconsistencies between his prior statements and his trial testimony, as well as inconsistences between the prior statements.

At a jury instruction conference, the prosecutor asked the trial court to instruct the jury with CALCRIM No. 361.  Defense counsel objected, and the trial court stated:  "I'm going to … indicate that that will provisionally not be given, but we'll revisit that."  The prosecutor asked, "Is there a reason for that, with all his statements that he failed to answer or gave nonresponsive answers?"  The trial court explained, "Yeah, I think that 90 percent -- most of those, if not all of them, were questions of, 'Why you didn't tell' -- 'Why you didn't bring that up in prior statements.'  And he answered them all here."

At a subsequent jury instruction conference, the trial court ruled as follows:  "Then [CALCRIM Nos.] 362 and 361, … defense [counsel] objected to those, … [the prosecutor] requested them.  I think they apply, certainly could be argued that they don't, but that can be handled in argument, or to what weight it should be given."

During her closing, the prosecutor argued:

"[D]efendant had several changes and inconsistencies in his testimony or would just conveniently forget to recall things, and … he skipped around when he was talking to certain detectives.

"So let's talk about it.  Defendant never told Officer Hernandez, Hutchins, or Avila he saw a shadow or a body by the front door all the way through the back, back by the back window, and that is why he entered [T.L.'s] house.  It is only at the December 11th, 2017, hearing, when he was under oath, and this trial, that he started to say that.  And in this trial,

17.

he now added, as you heard, 'Oh, it might not have been a body. I saw a shadow.'

"He also told … Hernandez, initially, when he … got to [T.L.'s] house for a second time, that he went around to her backyard and patio, and he entered her apartment and went straight to her bedroom.

"Then we move to his statement to … Hutchins. And now, he's going to her backyard, after, of course, knocking and knocking, not being able to get ahold of her, texting her, calling her, no answer, trying to get through the two front windows by the door that you would think he would have seen the body there, but, no.

"So then he is saying, now to Hutchins, that he went to the back fence because he was attempting to contact [T.L.], and when she didn't respond, he jumped over the fence of the enclosed patio anyways.

"Then, he talks to … Avila, …. [a]nd he says that he jumped the fence to her back patio because he wanted to see if people were smoking, right, the party was still going. He then talks about -- the other day when he was testifying, he b[r]ought up for the first time hearing a thump, when he was knocking on the front door and not getting an answer on the phone and not hearing anything else, but he -- all the sudden he heard a thump. Never said that to … Hernandez, … Hutchins, … Avila, or at his prior hearing under oath on … December 11th, 2017. How convenient. He had to give you a reason why he was staying there.

"What else? Well, he never mentioned to … Hernandez,… Hutchins, … Avila, or in the December 11th, 2017, hearing under oath, that the reason for staying in [T.L.'s] house and not leaving, after he enters through the back window, was because he wanted to stay and talk to [T.L.] about the broken window. This is new, folks.

"And this is just another way of him trying to give an excuse of why he stayed in the house when he should have left. He also never mentioned to Hernandez, … Hutchins, or …  Avila, that [T.L.] got angry and freaked out on him, after they hooked up, then conveniently took a nap together for a little bit and woke up, and he told her that he came in through the window, and then she went and checked the window, and then she got angry and comes back and starts getting mad at him and hits him.

"Never says that at all. That conveniently comes up at his hearing under oath on December 11th, 2017, and at this hearing. Because he had to make up an excuse that he thought would justify his reason of being there,

18.

when he should have left.  He consistently told … Hernandez, … Hutchins, and … Avila, as you saw in that interview yesterday, that she freaked out on him in the middle of this hooking up.  They never fell asleep.  She never got up and checked the window and was freaking out about the window.

"Conveniently, whenever the defendant was posed with a question he didn't want to answer, he chose to say, 'I don't recall.'  When defendant was given examples of his inconsistencies or his additions to his stories, he would say he jumps around when he tells his stories.

"[¶] … [¶]  [A]s you saw yesterday, when I played you that video of his thorough interview with … Avila, he said on three or four different occasions, not one, not two, but three or four different occasions, he tried, after trying to have vaginal sex with her, to have anal sex with her.  Why not admit to this when he was on the stand?  And not only did he not admit to that initially, but he admitted to you all that he lied to … Avila when he told him that.  He lied not once, not twice, but three or four times.

"Another big issue for … defendant is that when he was being interviewed by … Avila in that interview that you saw yesterday, he was asked multiple times, you saw it, if he put his penis in [T.L.'s] vagina.  How many times did it take him to say that he finally did that?  [¶] … [¶]  [I]t wasn't until the very end of the interview where he finally admits to putting the tip in to [T.L.'s] vagina.  Why lie?  What was he scared of?  He couldn't explain that to you.

"[¶] … [¶]  [An] instruction you'll get is regarding the failure to explain or deny adverse testimony.  And it says, 'If the defendant failed in his testimony to explain or deny evidence against him,' as I've just talked to you about, 'and if he could have been reasonably expected to have done so based on what he knew,' like why did he stay after all those different attempts of getting in, or the house being dark, or everybody being asleep, 'you may consider his failure to explain or deny in evaluating the evidence.' "

*D. Analysis re: Applicability of 361*

The People argue that:

"[T]he trial court did not abuse its discretion in finding that the instruction was warranted based on [defendant's] failure to explain adverse evidence against him.  In closing, the prosecutor explained the instances where she believed CALCRIM No. 361 applied, which were the following: (1) [defendant] did not tell police about seeing a shadow of a body when looking through [T.L.'s] back bedroom window, (2) he did not explain to

19.

the first two officers that he went to [T.L.'s] backyard to see if she was smoking, (3) he did not tell any of the officers about hearing a thumping sound from inside the apartment when he knocked on the door, (4) he did not tell any of the officers that the reason for not leaving the apartment immediately was that he wanted to tell [T.L.] about the broken window, (5) he did not tell any of the officers that he and [T.L.] fell asleep before [T.L.] freaked out, nor did he tell them that [T.L.] freaked out after seeing the broken window, (6) he answered 'I don't recall' when asked about inconsistencies and omissions from his prior statements, (7) he explained inconsistencies and omissions in his prior statement by claiming that he 'jumps around when he tells stories,' (8) he admitted that he tried to have anal sex with [T.L.] when he spoke to … Avila but took it back in his testimony, and (9) he initially denied intercourse when he spoke to … Avila, claiming that he only tried to have intercourse, but later conceded that he made slight penetration."

However, none of these nine "instances" warrant application of CALCRIM No. 361.

The first five instances involved statements defendant made (or did not make) prior to trial. As such, none of them warrant application of CALCRIM No. 361, which "addresses a *testifying* defendant's failure to explain or deny incriminating trial evidence." (*Cortez*, *supra*, 63 Cal.4th at p. 110, italics added.)[10] And while the prosecutor was well within her right to urge the jury to disbelieve defendant because his trial testimony included exculpatory details that he did not include in his prior statements to law enforcement, the addition of these details did not warrant the application of CALCRIM No. 361. (*Cortez*, *supra*, at p. 118 ["[T]he focus of CALCRIM No. 361, as its language indicates, is not on the defendant's credibility as a witness, but on the role of a testifying defendant's failure to explain or deny incriminating evidence in how jurors 'evaluat[e] that evidence,' i.e., the evidence the defendant has failed to explain or deny.

---

**10**  We note that the trial court also instructed the jury with CALCRIM No. 362, which does apply to statements made before trial, as follows: "If the defendant made a false or misleading statement, before this trial, relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt …."

In other words … a testifying defendant's failure to explain or deny incriminating evidence—i.e., '[a] defendant's silence'—cannot 'be regarded as a confession' and 'does not create a presumption or warrant an inference of guilt, but should be considered only in relation to evidence that he fails to explain or deny.' "].)

As to the sixth instance, that defendant "answered 'I don't recall' when asked about inconsistencies and omissions from his prior statements," the failure of a defendant to explain inconsistencies and omissions from his prior statements, standing alone, is insufficient to trigger application of CALCRIM No. 361. As *Cortez* explained, "the instruction applies only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge. The instruction acknowledges to the jury the 'reasonable inferences that may flow from *silence*' when the defendant 'fail[s] to explain or deny evidence against him' and 'the facts are peculiarly within his knowledge.' " (*Cortez*, *supra*, 63 Cal.4th at p. 117.) "[W]hen there is a 'material conflict in witnesses' testimony' [citation], when there are 'inconsistencies within the testimony of a single witness' [citation], [or] when a witness's 'efforts to explain away undisputed circumstances are inherently implausible,' " (*Cortez, supra,* at p. 118) the relevant instruction is CALCRIM No. 226, which states that, if a witness " 'deliberately lied about something significant,' " the jury should " 'consider not believing anything that witness says.' " (*Cortez, supra,* at p. 117.) The reason CALCRIM No. 226 applies, instead of CALCRIM No. 361, is that "[t]hese circumstances implicate a testifying defendant's *credibility* as a witness, and thus are properly addressed by an instruction designed to apply 'neutral standards of credibility' to testifying defendants." (*Cortez, supra,* at p. 118, fn. omitted.) Accordingly, this instance did not warrant application of CALCRIM No. 361.

As to the seventh instance, that defendant "explained inconsistencies and omissions in his prior statement by claiming that he 'jumps around when he tells

stories,' " as the People acknowledge, defendant provided an explanation. As an explanation was provided, even if it was "improbable, incredible, unbelievable, or bizarre," this instance did not warrant application of CALCRIM No. 361. (*Cortez*, *supra*, 63 Cal.4th at p. 117 ["Even if the defendant's testimony … may be characterized as improbable, incredible, unbelievable, or bizarre, it is not … 'the functional equivalent of no explanation at all.' "].)

As to the eighth instance, that defendant "admitted that he tried to have anal sex with [T.L.] when he spoke to … Avila but took it back in his testimony," defendant provided an explanation. He explained, "I thought [Avila] was going to tell me that there may have been DNA on [T.L.'s] anus. So the only reason I said that [to Avila], which it actually didn't happen, is because, from eating her out, saliva might have gone there, and I didn't want him to say, 'We found something on her anus.' " As an explanation was provided, even if it was "improbable, incredible, unbelievable, or bizarre," this instance did not warrant application of CALCRIM No. 361. (*Cortez*, *supra*, 63 Cal.4th at p. 117.)

Finally, as to the ninth instance, that defendant "initially denied intercourse [with T.L.] when he spoke to … Avila, claiming that he only tried to have intercourse, but later conceded that he made slight penetration," this instance did not warrant application of CALCRIM No. 361 for the same reason as the first five instances. That is, this instance involved statements defendant made (or did not make) prior to trial.

Accordingly, none of the instances identified by the People warranted application of CALCRIM No. 361. Additionally, we have reviewed the record, and have not identified any failure to deny or explain that would warrant its application. As there was no evidence in the record to support the application of CALCRIM No. 361, the trial court erred by providing it to the jury.

*E. Analysis re: Harmlessness*

Defendant argues that the error was not harmless because, among other reasons, this was a close case that involved a credibility contest, and "CALCRIM No. 361 put the

22.

court's thumb on the scale in favor of the prosecution by inviting the jury to consider [defendant's] failure to adequately explain his innocence as evidence of his guilt."

The People disagree. According to the People, the error was harmless for three reasons.[11] First, the People argue that, "if CALCRIM No. 361 was given erroneously because [defendant] had not failed to deny or explain adverse evidence within his knowledge, the jury would have disregarded the instruction." Second, the People argue that the error was harmless because "the instruction makes clear that [defendant's] failure to explain or deny evidence 'is not enough by itself to prove guilt,' " and it "allows the jury to 'decide the meaning and importance' of any failure to explain or deny." Third, the People argue that "substantial evidence supported the jury verdict, regardless of the CALCRIM No. 361 instruction."

None of these arguments have merit. As to the first two arguments, it is true that the trial court instructed the jury that "[s]ome of [the] instructions may not apply depending on your findings about the facts of the case," and we generally " 'presume the jury understood and followed the [trial] court's instructions.' " (*People v. Erskine* (2019) 7 Cal.5th 279, 303.) It is also true that CALCRIM No. 361 allows the jury to decide "the meaning and importance" of a defendant's failure to explain or deny evidence against him. (CALCRIM No. 361.) However, in this case, it is reasonably likely that the jury applied CALCRIM No. 361, and that they did so in a manner inconsistent with *Cortez*. (*Cortez*, *supra*, 63 Cal.4th at p. 117.)

To begin, the prosecutor focused heavily on inconsistences and omissions in defendant's statements and testimony, both when cross-examining defendant, and in her closing argument. After pointing out numerous inconsistences and omissions, the prosecutor urged the jurors to apply CALCRIM No. 361, asserting: [An] instruction

---

[11]   We need not determine which standard applies to the error here, because, even under the *Watson* standard, the error was not harmless.

you'll get is regarding the failure to explain or deny adverse testimony. And it says, 'If the defendant failed in his testimony to explain or deny evidence against him,' as I've just talked to you about, 'and if he could have been reasonably expected to have done so based on what he knew,' like why did he stay after all those different attempts of getting in, or the house being dark, or everybody being asleep, 'you may consider his failure to explain or deny in evaluating the evidence.' " However, as the prosecutor herself pointed out, defendant did provide explanations. He testified that he entered T.L.'s apartment because (among other reasons) he saw a body on the floor, and he stayed because (among other reasons) he wanted to tell T.L. about the broken window. Thus, not only did the prosecutor urge the jury to apply CALCRIM No. 361, she urged the jury to apply it because defendant's explanations were inadequate, which is improper. (*Cortez*, *supra*, 63 Cal.4th at p. 117.)

While the jury was instructed to follow the trial court's instructions if there was a conflict between those instructions and an attorney's comments on the law, there was no apparent conflict between the prosecutor's argument and the court's instruction. In fact, prior to the decision in *Cortez*, courts had held that, "[w]hen a defendant testifies … and 'fails to deny or explain inculpatory evidence or gives a "bizarre or implausible" explanation, the instruction is proper.' " (*People v. Vega* (2015) 236 Cal.App.4th 484, 498; *People v. Sanchez* (1994) 24 Cal.App.4th 1012, 1029.) While the *Cortez* court ultimately rejected this view, holding that "[e]ven if the defendant's testimony conflicts with other evidence or may be characterized as improbable, incredible, unbelievable, or bizarre, it is not … 'the functional equivalent of no explanation at all,' " (*Cortez*, *supra*, 63 Cal.4th at p. 117), it also noted that the "divergent views [were] understandable under existing case law." (*Cortez*, *supra*, 63 Cal.4th at p. 112.) Moreover, as defendant points out, "[i]f [the People], the prosecutor, and the trial [court] all believe[d] that CALCRIM No. 361 was applicable as supported by the evidence, there is every reason to believe that the jury did the same."

24.

Finally, while the jury was instructed that a failure to explain or deny was "not enough by itself to prove guilt," CALCRIM No. 361, combined with the prosecutor's argument, allowed the jury to give additional weight to evidence that defendant did not adequately explain or deny. (*People v. Grandberry, supra,* 35 Cal.App.5th at p. 605 ["CALCRIM No. 361 rests on the logical inference that if a person charged with a crime is given the opportunity to explain or deny evidence against him or her but fails to do so, then that evidence may be entitled to added weight."].) This is different than the general rule that "the rejection of testimony 'does not create affirmative evidence to the contrary of that which is discarded.' " (*Edmondson v. State Bar* (1981) 29 Cal.3d 339, 343; see also *People v. Centeno* (2014) 60 Cal.4th 659, 673 ["even if the jury rejects the defense evidence as unreasonable or unbelievable, that conclusion does not relieve or mitigate the prosecutorial burden. The prosecution cannot suggest that deficiencies in the defense case can make up for shortcomings in its own."].)

Given the above, there is no reason for the jury to have concluded that, no matter what factual findings they made, CALCRIM No. 361 did not apply. Moreover, as the prosecutor urged the jury to apply CALCRIM No. 361 based on a failure to adequately explain evidence, and as it was not clear to the jury, based on the instruction or otherwise, that CALCRIM No. 361 could not be applied in this manner, it is likely that the jury applied CALCRIM No. 361 and did so incorrectly. (See *People v. Stutelberg* (2018) 29 Cal.App.5th 314, 318 [while "jurors are generally able to evaluate the facts of a case and ignore factually inapplicable theories," they "are presumed to be less able to identify and ignore an incorrect statement of law due to their lack of formal legal training"].)

As to the People's third argument, we do not disagree that substantial evidence supports the verdict. When evaluating a sufficiency of the evidence claim, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a

25.

reasonable doubt.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "The test for evaluating a sufficiency of evidence claim is deferential…." (*People v. Flores* (2020) 9 Cal.5th 371, 411.) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.) However, defendant does not raise such a claim, and these standards do not apply. Instead, as explained above, we must determine whether it is reasonably probable the defendant would have obtained a more favorable result had the error not occurred. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

And here, it was a close case.[12] Each victim asserted that the encounter was (or ended up becoming) non-consensual, defendant asserted both counters were consensual, and there was little to no corroborating evidence either way.[13]

And while, as the prosecutor amply demonstrated, there were inconsistencies between defendant's prior statements and his trial testimony, there were credibility issues with S.J.'s testimony and T.L.'s testimony as well. For example, Williams, the sexual assault forensic examiner nurse who examined S.J., testified that she asked S.J. if she

---

[12]    We note that some "cases have found it persuasive that the first trial ended in a hung jury when deciding whether the error that occurred in the retrial was prejudicial," and it appears that the first trial ended in a hung jury. (*People v. Soojian* (2010) 190 Cal.App.4th 491, 520.) However, we have no record of what occurred during the first trial.

[13]    The nurse who examined S.J. did testify that S.J. had bruising on her right knee, bruising on her upper back, a bruise on her right arm, a small bruise on her neck, and an approximately five-centimeter scratch on her neck. However, this is not necessarily inconsistent with defendant's version of events, and the People do not argue otherwise.

As to the incident involving T.L., as the trial court noted, it was "fairly beyond dispute that [defendant] entered through a window into [T.L.'s] residence." However, despite this undisputed evidence, the jury could not reach a verdict on count 3, on which they were instructed, "[t]o prove … defendant is guilty of this crime, the People must prove that, one, … defendant entered a residence or a room within the residence; and, two, when he entered a residence or room within a residence, he intended to commit rape."

used alcohol within 12 hours prior to the assault, and S.J. "said no." Ames, a police officer who interviewed S.J., testified that S.J. told him she had been drinking but she was not intoxicated. Then, at trial, S.J. admitted that she was intoxicated at the time of the assault, and that her memory is "not great when intoxicated" (although she also testified that she still remembers the "important things"). Thus, not only were there inconsistencies, S.J. admitted to having memory issues at the time of the incident.

As to T.L., she testified that she was not attracted to defendant, she did not flirt with defendant, and she refused two kisses from defendant. M.H., T.L.'s friend, corroborated T.L.'s version of events. However, according to M.N., a prosecution witness who testified that he met defendant on the evening of the incident, T.L. flirted with defendant at the liquor store. M.N. also testified that, when he and defendant went to T.L.'s apartment the first time, she was "way over-the-top flirtatious." Of course, T.L. could have flirted with defendant and not consented to sexual relations with him, but it does go to her credibility. Additionally, Hernandez, a police officer who spoke with T.L. on the day of the incident, testified that T.L. told him she never blacked out during the incident. However, at trial, she testified that she blacked out while defendant was sexually assaulting her, and when she "woke up from this blackout," she was on top of defendant.

In conclusion, the trial court erred by instructing the jury with CALCRIM No. 361. The instruction is susceptible to multiple interpretations, and the prosecutor urged the jury to apply it based on defendant's failure to adequately explain evidence. As the prosecutor's argument was a reasonable (although legally incorrect) interpretation of the instruction, and as under the proper interpretation the instruction was not applicable no matter what factual findings the jury made, it is likely that the jury applied CALCRIM No. 361 in the manner argued by the prosecutor. Given the closeness of the case, the inconsistencies between defendant's trial testimony and the prosecutor's evidence, and the prosecutor's focus on the inconsistencies in defendant's statements and testimony,

27.

this error was prejudicial.[14]  Accordingly, we reverse the judgment and remand for further proceedings.

## II.  THE DESTRUCTION OF DEFENDANT'S CELLPHONE DID NOT VIOLATE HIS RIGHT TO DUE PROCESS[15]

Defendant argues that his cellphone was potentially useful to his defense, and that "[e]armarking it for destruction by putting it in 'safekeeping' was not in good faith."  The People agree that the cellphone contained evidence that was potentially useful to defendant, but the People argue that defendant failed to prove bad faith.

### A.  Applicable Law and Standard of Review

The State's failure to retain evidence violates a defendant's due process rights under the United States constitution when the evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  (*Trombetta*, *supra*, 467 U.S. at pp. 488–489; see also *City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 8 (*City of Los Angeles*).)  The State also violates a defendant's due process rights when it fails to retain evidence "that is potentially useful

---

**14**     We also note that the trial court instructed the jury with CALCRIM No. 1191B, which informed the jury that if they found defendant guilty on count 1, 2, 3, or 4 beyond a reasonable doubt, they "may but are not required to conclude from the evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offenses charge in this case."  Thus, even if the jury erroneously applied CALCRIM No. 361 to the charges stemming from only one incident, the jury was allowed to use those guilty findings as evidence defendant was guilty of the charges stemming from the other incident as well.

**15**     While we need not and do not address defendant's other claims of error, we address this claim because dismissal of the case is a standard remedy, and that is the remedy defendant seeks.  (See, e.g., *People v. Alvarez* (2014) 229 Cal.App.4th 761, 779 (*Alvarez*) ["There are few cases after [*Arizona v. Youngblood* (1988) 488 U.S. 51] … where the bad faith destruction of material exculpatory evidence warranted anything less than dismissal, and dismissal is proper if less drastic alternatives are unavailable."].)

to the defense," but only if "the accused can show bad faith by the government." (*City of Los Angeles*, 29 Cal.4th at p. 8; *Arizona v. Youngblood, supra,* 488 U.S. at pp. 57–58.)

"We review the trial court's decision on a *Trombetta*/*Youngblood* motion under the substantial evidence standard. [Citations.] 'In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence--that is, evidence that is reasonable, credible, and of solid value' in support of the court's decision. [Citation] ' " ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " ' " (*Alvarez, supra,* 229 Cal.App.4th at p. 774.)[16]

*B. Additional Background*

On March 28, 2023, the trial court held a hearing on defense counsel's *Trombetta* motion.[17]

Defense counsel alleged that "[l]aw enforcement lost [his] client's [cell]phone which contains important information as to impeachment of [S.J.], in particular, stating that she did not have any contact with [his] client after the alleged rape." Defense counsel further alleged that defendant "represented to [defense counsel] that there are voicemails saved, messages saved, that could be material to his defense."

The prosecutor asserted that defendant's cellphone "was booked for safekeeping rather than evidence," and as a matter of the Fresno Police Department's policy, property in safekeeping is destroyed "after a certain amount of time." The Fresno Police Department initially looked at the contents of the phone and found a text message

---

[16] Defendant argues that, because the facts are undisputed, we review the trial court's decision de novo. However, defendant's argument fails under either standard.

[17] It appears that defense counsel filed a motion, and the prosecutor filed a response. However, neither is part of the record before us.

between M.N. and defendant "related to the timeline of July 24." A copy of this message was provided to defense counsel. According to the prosecutor, "there was no knowledge of any exculpatory evidence and no bad faith on the part of the government." The prosecutor further argued that there was no prejudice because defense counsel subpoenaed defendant's cellphone records, which would show whether S.J. contacted defendant after the incident.

Defense counsel responded that a cellphone is not "cumbersome" to keep, and that bad faith can be inferred, "especially since … Avila, in the case, said that the phone would be kept for safekeeping." Defense counsel further responded that the phone records he subpoenaed did not include the text of any messages that were sent between defendant and the alleged victims, and "the text messages themselves would be material and exculpatory."

The trial court denied the motion. The trial court found that "much of … the problem can be cured with the business records." The trial court also ruled that, if defendant testified regarding the information that was destroyed, such as the contents of a specific message, and if the prosecution tried to discredit that testimony, then the fact that the Fresno Police Department destroyed defendant's cellphone would become admissible.

*C. Analysis*

We agree with the parties that defendant's cellphone contained evidence that was potentially useful to the defense. However, defendant fails to show bad faith by the government. Defendant's argument relies on the assumption that defendant's cellphone was intentionally placed into safekeeping, where it would be destroyed pursuant to policy.[18] However, there is little evidence in the record suggesting this was the case.

---

[18] Defendant does not argue that the exculpatory value of the cellphone was apparent before the cellphone was destroyed, nor do we see any evidence in the record suggesting that it was.

During a preliminary hearing in March of 2021, Avila testified that there were relevant or important text messages on the cellphone.[19] He also testified that he did not believe there was anything of evidentiary value on the cellphone, that he booked the cellphone into evidence, and that the cellphone was still there.

As it turns out, defendant's cellphone was not placed into evidence, but was instead put into safekeeping, meaning that it was eventually destroyed pursuant to policy. However, based on the limited record before us, we cannot conclude that Avila (or anyone else) intentionally placed the cellphone into safekeeping, with knowledge of its exculpatory value, so that it would be destroyed. (*Arizona v. Youngblood*, *supra*, 488 U.S. at p. 58 ["requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant"].)

As mentioned above, defense counsel's motion is not part of the record before us. Additionally, it does not appear that defense counsel requested to cross-examine Avila or otherwise put on evidence regarding bad faith on the part of the government. We do not even have evidence regarding when the cellphone was destroyed, which is particularly relevant considering defendant was arrested in 2016, the first trial was held in 2017, and the second trial was held in 2023. That is, given that the second did not occur until 2023, defendant's cellphone may have been in police custody for years before it was destroyed pursuant to policy. If this is the case, it seems unlikely that Avila (or any other officer) would have placed the cellphone into safekeeping with the intention of preventing

---

[19] A text message from defendant to M.N. was provided to defense counsel at some point.

31.

defendant from accessing exculpatory evidence, given that the trial was likely to occur before the cellphone was destroyed.

Accordingly, on this limited record, defendant did not carry his burden to show his cellphone was destroyed in bad faith.

In arguing to the contrary, defendant relies on *United States v. Cooper* (9th Cir. 1993) 983 F.2d 928 (*Cooper*) and *Alvarez*, *supra*, 229 Cal.App.4th 761, but both are readily distinguishable.

In *Cooper*, the Drug Enforcement Agency suspected that a lab run by the defendants was being used to manufacture methamphetamine, and it destroyed the lab equipment. (*Cooper*, *supra*, 983 F.2d at pp. 929–930.) While the court ultimately upheld a dismissal for failure to preserve potentially exculpatory evidence, the government only challenged "the district court's determination that [the defendants] could not reasonably obtain evidence comparable in value to the destroyed laboratory equipment." (*Id.* at pp. 931, 933.) The government left "unchallenged the district court's conclusion that the police acted in bad faith by allowing the equipment to be destroyed while assuring [a defendant] and his attorney that it was being held as evidence." (*Id.* at p. 931.)

As the government in *Cooper* conceded bad faith, the element at issue here, *Cooper* has minimal relevance. Moreover, unlike *Cooper*, there is no evidence here that the government destroyed defendant's cellphone while assuring him that it was being held as evidence.

In *Alvarez*, three defendants were arrested for robbery. (*Alvarez*, *supra*, 229 Cal.App.4th at p. 764.) One of the defendants, Cisneros, asked the detective on scene to check for any video recordings. (*Ibid.*) "The detective replied, 'If I had video cameras of what took place, that's part of my job. My job is not to arrest people that aren't guilty of something.' Yet the detective later admitted he had never reviewed any video himself, nor asked anyone else to do so. He asserted it was not his responsibility." (*Id.* at pp. 764, 769.) Additionally, at a hearing that was held a day after the criminal complaint was

filed, counsel for Cisneros "requested an order that *any* video be preserved." (*Id.* at p. 765.) "The prosecutor interjected at that point and stated, 'I informed [Cisneros's counsel] that we are willing to comply with PC [1054.1]. And in regards to the videos, we had already requested those be held. [¶] I'm opposed to any kind of warrant going out at this point in time, and the People are already in the process of obtaining the videos. [¶] I think that's the appropriate way to go about getting the evidence. [¶] At this point in time, there's no possibility that they are going to be destroyed. We're within 30 days." (*Id.* at pp. 765, 770, 777.) However, none of the officers requested to view the footage, and it had been deleted by the time Cisneros's attorney requested it. (*Id.* at pp. 768, 777.) The trial court "determined the [police department] and the prosecution were well aware of the potential usefulness of the video, and did nothing, despite their knowledge that the [police department's] policy at the time was only to preserve video for a short period." (*Id.* at p. 777.)

The appellate court ultimately found that the officers' conduct was "disturbing." (*Alvarez, supra*, 229 Cal.App.4th at p. 777.) "When asked by Cisneros to review the video, [a detective] told Cisneros that it was 'part of [his] job.' In court, however, he first failed to recall Cisneros asking him to watch any video of the area. After his recollection was refreshed by the recording, [the detective] disclaimed all responsibility to follow up on the video, and had no idea who the individual responsible for doing so might be. When taken together with the prosecution's statement at the initial hearing that steps were being taken to preserve the video, this amounted to more than mere negligence; the trial court concluded this was bad faith, and that finding is supported by substantial evidence." (*Ibid.*)

*Alvarez* is distinguishable both as to the posture of the case and as to its facts. The *Alvarez* court was reviewing a trial court's bad faith finding for substantial evidence, whereas here, the trial court did not find bad faith. Moreover, based on the limited record before us, Avila's conduct was not disturbing. It is true that the cellphone was placed

into safekeeping and destroyed rather than being placed into evidence and preserved. However, there is nothing in the record suggesting that Avila (or any other officer) intentionally placed the cellphone into safekeeping rather than evidence, knowing that it would be destroyed. Finally, unlike in *Alvarez*, is no indication in the record that the evidence was destroyed after defense counsel requested that it be preserved.

Accordingly, defendant failed to show bad faith by the government, and this claim fails.

## DISPOSITION

Defendant's convictions are reversed. The People may choose to retry defendant on these charges. (*People v. Hernandez* (2003) 30 Cal.4th 1, 10 ["the law is clear that, as a general rule, errors other than insufficiency of evidence do not preclude retrial following reversal of conviction"].) The matter is remanded for further proceedings consistent with this opinion.


FRANSON, Acting P. J.

WE CONCUR:


MEEHAN, J.


SNAUFFER, J.


34.